MARIA L. RAY, Appellant, v. SAMANTHA J. WALK-
ER et al.

### Division Two, April 7, 1922.

1. **WILL: Attestation: Peremptory Instruction.** A will must be
   attested by two witnesses, or it cannot be admitted to probate;
   and the testator must know that he is signing his will and that
   the subscribing witnesses are attesting his signature thereto as
   his will. Testimony by one witness that the testator s'gned the
   will in the presence of himself and another, and that both signed it
   in the testator's presence, if corroborated by such other, would
   authorize the jury to find that the testator understood the instru-
   ment, signed it as his will and requested said witnesses to attest
   it as such; but where such other testified that he was present
   while the will was being written and was a witness to it, but did.
   not testify that the testator signed the instrument in h's presence
   or acknowledged the signature thereto to be his, or that he signed
   it as a witness in the presence or with the knowledge and at the
   request of the testator, the trial court erred in assuming, in the
   face of much evidence to the contrary, that the instrument was
   executed by one having testamentary capacity, in the presence of
   two witnesses, and that they attested in his presence and at his
   request, and in giving a peremptory instruction directing the jury
   to sustain the will.

2. ———: **Testamentary Capacity: Impaired Memory.** When memory
   has ceased to function testamentary capacity is lacking. If one
   cannot recall or comprehend what he has done for, or the obli-
   gations he morally owes to, the natural objects of his bounty, he
   cannot be said to have testamentary capacity.

3. ———: ———: ———: **Inequalities.** Where the will shows on its
   face that the testator's purpose was to disinherit a granddaughter
   and to give a mere fraction of his estate to his grandsons (the
   children of a deceased daughter), and then to make an equal dis-
   tribution of the residue of his estate between his surviving sons
   and daughters, and the clauses by which he has attempted to
   make such equal distribution show palpable and gross inequalities
   (which of themselves tend to establish failing memory and in-
   ability to comprehend the nature and value of his estate), and in
   addition to them the parole testimony tends to show that the
   very old testator suffered a paralytic stroke which seriously im-
   paired his mental faculties, after which his mental feebleness in-

creased, he became childish, his mind wandered, he was unable to carry on a conversation, and no longer knew neighbors and friends whom he had known and dealt with for many years, all before his will was made, the question of his testamentary capacity is for the jury to determine.

4. ———: **Undue Influence: Mental Weakness.** Extreme mental and physical weakness furnish an inviting field for undue influence; and where the decrepitude and infirmities of great age had come upon the testator, he had suffered a paralytic stroke which seriously impaired his physical and mental faculties and rendered him feeble in body and mind, he was constantly surrounded by the chief beneficiaries of his will, upon whom he had for years prior to its execution been dependent for personal wants and the transaction of his business, and the will was drawn under circumstances manifesting studied arrangements for their absence and its concealment, and drawn by a casual acquaintance, brought with another accommodating witness, from a distant village, who testified that testator, without any prompting, gave clear and explicit directions, while numerous witnesses testified that it was extremely difficult for his old acquaintances to converse with him, the question of undue influence is for the jury to determine.

5. ———: **Change In Affections: Testamentary Capacity.** It is for the jury to say whether a change in testator's feeble old age of life-long and cherished affection for his daughter and certain worthy grandchildren is evidence of testamentary incapacity.

6. ———: **Unnatural Will: Necessity for Explanation.** Unjust and unnatural provisions in a will, showing gross inequalities, call for explanation, where there is also evidence tending to show undue influence or lack of testamentary capacity, whether or not there is evidence establishing a confidential relation between testator and the chief beneficiaries.

7. **CONVEYANCES: Delivery: Subject to Recall.** Delivery of a deed must be attended with the grantor's intention to divest himself of title and be accepted by the grantee with intent to take the title as indicated therein; and so long as it is in the hands of a depositary subject to be recalled by the grantor at any time, there is no delivery. So that where the testator, after he had executed his will, in which he gave to each of two sons, Charles and Newt, certain amounts of money and then added that "this amount of cash with the real estate I have deeded to him this day will equal his share of 'my estate," and testator handed the will and deeds to a daughter and told her to "put them away and keep them until I am gone, and then I want you to give them to Charles and Newt, my executors," and she placed them in an envelope and accepted the deeds with the understanding on her part that she took them

for safe-keeping, subject to testator's right to recall them at any time, there was no delivery of the deeds unless they were incorporated in the will and made a part of it.

8. ———: ———: ———: **Incorporated in Will.** Deeds executed simultaneously with grantor's will and referred to in the will as having been made on the same day, and delivered to the same depositary along with the will, although accepted by the depositary with the understanding that testator had a right to recall them, are to be considered as incorporated in the will and made part and parcel of it, and upon the probate of the will become operative.

Appeal from Jackson Circuit Court.—*Hon. Allen C. Southern,* Judge.

REVERSED AND REMANDED.

*J. D. Harris* for appellant.

(1) Where there is substantial evidence to support either of the grounds stated in the petition for contesting the will, undue influence or unsoundness of mind, the issue becomes one for the determination of the jury, and not one to be determined by peremptory instruction. Mowry v. Norman, 204 Mo. 178; Moore v. McNulty, 164 Mo. 111; Bradford v. Blossom, 190 Mo. 111. In the case at bar there was substantial proof both of unsoundness of mind and of undue influence. On the issue of mental capacity, the burden rests upon the proponents, and not upon the plaintiff. Mowry v. Norman, 204 Mo. 189. (2) Under ordinary circumstances in a will contest the burden is upon the plaintiff, throughout, to show undue influence, and upon the defendants to show mental capacity, and the legal execution of the will. But where plaintiff shows a state of facts which establishes a fiduciary relation or some such similar confidential relation between defendants, as principal beneficiaries, and the testator, then upon that showing the burden, as to undue influence, shifts to the defendants. Not only this, but by proof of such relation and such a bequest, the law indulges the presumption that undue influence has been used. Mowry v. Norman, 204 Mo. 189; Bradford v. Blossom, 190 Mo.

293 Mo.—29

243; Campbell v. Carlisle, 162 Mo. 644; Hagney v. Head, 126 Mo. 627, 628; Roberts v. Bartlett, 190 Mo. 701; Dausman v. Rankin, 189 Mo. 708; Maddox v. Maddox, 114 Mo. 40. And under the facts of this case, the relation of parent and child is sufficient to show such fiduciary and confidential relationship, so as to raise the presumption of undue influence. Mowry v. Norman, 204 Mo. 194. (3) The deeds in this case sought to be cancelled, are void and not effectual as conveyances of title, for the reason that they were not delivered to the respective grantees in the lifetime of the grantor, nor to a third person with direction to deliver them to the grantees after his death, nor did he relinquish his right of control and recall over them. Mudd v. Dillon, 166 Mo. 110; Bunn v. Stuart, 183 Mo. 375; Noble v. Tipton, 76 N. E. 151, 3 L. R. A. (N. S.) 645; Cole v. Cole, 108 N. W. 101; Cook v. Brown, 34 N. H. 460. The lodgment of a deed properly executed and acknowledged by the grantor in a place to which the grantee has access, and from which he can without hindrance transfer it to his own possession, with the intention on the part of the grantor that the grantee may, after his death, take it and have it recorded does not constitute a delivery of the deed. Scott v. Scott, 95 Mo. 300; Huey v. Huey, 65 Mo. 689; Brown v. Brown, 66 N. E. 316. (4) Where a deed is invalid and inoperative by reason of non-delivery, a reference to it in the will of the grantor can not be held to amount to a devise by implication of the property described in such deed to the grantees therein. Noble v. Tipton, 76 N. E. 151, 3 L. R. A. (N. S.) 645; Benson v. Hall, 150 Ill. 60; Page on Wills, sec. 468; Underwood on Wills, sec. 475; Lange v. Cullinan, 205 Ill. 365.

*J. W. Halliburton & Son* and *McReynolds & McReynolds* for respondent.

(1) There was no substantial evidence that Elias Keener was of unsound mind at the time of the execution of the will in controversy, or at any time, and a large amount of evidence that he was of sound mind and capable

of making a will and transacting ordinary business. Sanford v. Holland, 276 Mo. 457; Hahn v. Hammerstein, 272 Mo. 259; Giboney v. Foster, 230 Mo. 130; Winn v. Grier, 217 Mo. 458; Bensberg v. Washington University, 251 Mo. 656. In such cases the settled rule is that the trial court should direct a verdict upholding the will in that issue. McFadden v. Catron, 138 Mo. 226, 277; Story v. Story, 188 Mo. 128, 129; Teckenbrock v. McLaughlin, 209 Mo. 540; Hayes v. Hayes, 242 Mo. 172; Currant v. Currant, 244 Mo. 438; Scheiberl v. Scheiberl, 261 Mo. 732; Holton v. Cochran, 208 Mo. 314, 410; Weston v. Hanson, 212 Mo. 248, 266; Knapp v. St. Louis Trust Co., 199 Mo. 663; Kischmann v. Scott, 166 Mo. 227; Riggen v. Westminster College, 160 Mo. 579. In applying the rule as to mental capacity required to make a will, it has long been adjudged that a failure of memory from old age or sickness, forgetfulness of names of persons one has known, idle questionings requiring repetition of information, and personal eccentricitites and oddities are not such evidence of mental disease and deterioration as will render one incapable of disposing of his property by will. Hahn v. Hammerstein, 272 Mo. 259; Giboney v. Foster, 230 Mo. 131; Winn v. Grier, 217 Mo. 449; Southworth v. Southworth, 173 Mo. 59, 72; Bensberg v. Washington University, 251 Mo. 658; Giboney v. Foster, 230 Mo. 106. Competency to make a will may exist where business capacity might fail or be lacking. Wolfe v. Whitworth, 170 Mo. App. 374; Thomas v. English, 180 Mo. App. 364; Balak v. Susanka, 182 Mo. App. 478. (2) There is no substantial evidence in the record of undue influence, and no evidence of any confidential relations such as to raise a presumption of undue influence. The only relations were, such as exist between parent and children. Sanford v. Holland, 276 Mo. 470; Lorts v. Wash, 175 Mo. 502, 505; Seibert v. Hatcher, 205 Mo. 104; Mackall v. Mackall, 135 U. S. 112; Winn v. Grier, 217 Mo. 460. (3) The trial court did not err in dismissing plaintiff's bill contained in the second count of her petition for two reasons: (a) The evidence of Samantha J. Walker shows the deeds were delivered

with the intention of parting with the control. (b) Even though the court should find the deeds were not delivered, yet if the will is held valid then the deeds are necessarily held valid as part of the will. Crites v. Crites, 225 S. W. 992; Meredith v. Meredith, 229 S. W. 181; Burkey v. Burkey, 175 S. W. 624; Cook v. Newby, 213 Mo. 490. (4) Even if the court should conclude that the deeds were not delivered in the life-time of Elias Keener, then under the law the title to the land described in said deeds passes to the grantees therein by virtue of the will. With the will held valid, it necessarily follows that the deeds should be upheld. Stewart v. Jones, 219 Mo. 614; Cox v. Jones, 229 Mo. 53; Paulus v. Birch, 127 Mo. App. 255. (5) The deeds were a part of the will. Harvey v. Choteau, 14 Mo. 587; 40 Cyc. 1094, par. 8; Shulsky v. Shulsky, 157 Pac. 407; In re Noyes, 40 Mont. 231; McIlvaine v. Robson, 161 Ky. 616; Smith v. Smith, 154 App. Div. 313; Maris v. Adams, 166 S. W. 475; Snyder v. Greendale Land Co., 91 N. E. 619; Hackley v. Kelly, 5 Ky. L. Rep. 763; Condit v. DeHart, 62 N. J. L. 78; Jackson v. Babcock, 12 Johns. Cas. 389; Capp v. Bryner, 132 Pa. St. 417; Whitman's Appeal, 2 Grant, 323; Ford v. Ford, 70 Wis. 19, 5 Am. St. 117; Kidd v. Borum, 181 Ala. 144; Thornberry v. Fletcher, 91 Kan. 744, 139 Pac. 391; Jennings v. Reeson, 166 N. W. 931; In re Fowler, 222 N. Y. 222; Lawrence v. Burnett, 96 S. E. 144.

HIGBEE, P. J.—This is an action to set aside the will of plaintiff's father, Elias Keener, and to cancel deeds made by him to his daughter, Mrs. Walker, and his three sons, Wilbert N., Charles H. and William E. Keener. The petition is in two counts; the first to contest the will, the second to cancel the deeds. The issues on the first count were submitted to a jury, and those on the second to the court at the same time. At the conclusion of the evidence, the court directed the jury to return a verdict sustaining the will, and found for the defendant on the second count. Plaintiff appealed.

Elias Keener lived for many years on his farm of two hundred and eighty acres six miles northeast of

Carthage in Jasper County. He also owned ten acres of timber land, and a house and two lots in Carthage. He died December 13, 1918, at the age of ninety-three, his wife having died in 1895. He left surviving him three sons and two daughters—Maria L. Ray, the plaintiff, Samantha Jane Walker, Wilbert N., Charles H. and William E. Keener. He had three grandchildren—George M., Charles E. and Florence M. Church, children of his deceased daughter Sarah A. Church, who died in 1904. Florence married Elmer Tinder in 1906 and died in July, 1918, leaving two little girls, aged eight and eleven. The nine children of William E. Keener were also made defendants, as they take an estate in remainder under the deed to their father.

Until Mr. Keener was well advanced in years, the evidence tends to show that he was a normal man, attending to all of his business. As early as 1908, when he was eighty-three years of age, he, in a large measure, ceased his activities. His physical and mental strength had become seriously impaired, also his sight and hearing. In the latter part of 1910 he suffered a paralytic stroke, which further impaired his bodily and mental faculties. For sometime he was unable to speak and was helpless. Thereafter, until his death, it was difficult for any one, except members of his family and his most intimate acquaintenances, to converse with him. Prior to the making of his will, he failed to recognize old neighbors and acquaintances. In conversing with them, when told who they were, he would forget their names and the subject of the conversation. Often during a conversation he would fall asleep. His mind wandered. In his earlier years he raised good crops of wheat. He hauled this to market and could readily reckon its value. So, with his cattle and hogs. After 1908 he was unable to count up little pasture bills of four or five dollars, but would get Mrs. Walker or one of the Church boys to do that for him.

On June 30, 1913, Mr. Bert Webb, who lived at Jasper, eleven miles distant, at the request of Wilbert N. Keener, came to Mr. Keener's residence to write his will.

He brought his typewriter and some blank deeds. How he came to bring the blank deeds is unexplained. No one seems to have understood that Mr. Keener wished to execute any deeds. According to his testimony, Mrs. Walker got her father's deeds and handed them to Webb. Webb brought Mr. Gore with him to attest the will. No one else was in the room while the will and four deeds were being written and executed. The three sons were in the door-yard, and Mrs. Walker in the kitchen. Keener gave Webb the names of the persons to whom he wished to devise his property and what he wished to give each. Webb had no trouble or difficulty in understanding him. He had known Keener fifteen or twenty years; didn't see him very often, passed his place occasionally; Keener's mind was sound and clear beyond a doubt. When the deeds and will were written, Keener signed them in his presence, after the will was read to him. ''Gore and myself signed the will as witnesses in his presence.'' The deeds and will were then put in an envelope. Mr. Keener handed them to Mrs. Walker, saying: ''You take these. I want you to take these and put them away and keep them until I am gone and then I want you to give them to Charlie and Newt, my executors.''

John M. L. Gore testified by deposition; lives in Mississippi; lived in Jasper County twenty years, five miles from Keener's farm; knew Keener ninteen years; saw him about once a week; mental condition as good as the average man of his age from 1910 till witness left Jasper County; don't remember his having a stroke of paralysis; if he did, it didn't affect his mind. I remember him making a will in the year 1913 and I was a witness to the will; Bert Webb wrote it; Keener gave directions as to the disposition of his property and I was present while the will was being written. At the time of the writing and signing of the will, he knew his children, grandchildren and what property he had. He said his daughter, Mrs. Ray, had written him several years before for money to go to a hospital for an operation; that if her father would furnish the money, it would be of more benefit to her than anything he could leave

her at his death, and he said he sent her the money and he did not think she should have anything at his death, as he thought she had received her share of his estate by the money he sent her. The will was read to him; he was fully competent to make a will at the time it was made. I don't recollect distinctly about the deeds, but if they were written, the same notary, Bert Webb, wrote them. Keener had sufficient mental capacity to furnish any information and transact any ordinary business at the time and before the will was signed. No one influenced him. He lived with his daughter Martha, and my recollection is he gave her nothing in this will. I do not know that the will in suit between Maria Ray and the other children of Elias Keener is the will I witnessed. I know I only witnessed one will; the will in this suit will speak for itself.

The will gives to George M. and Charles E. Church $900 each and to Florence M. Tinder $25. It then reads:

"5th. I give, devise and bequeath to my daughter Samantha J. Walker the sum of one dollar in cash, and all household goods, stock and personal property other than cash and notes. I have this day deeded to said Samantha J. Walker real estate which will equal her share of my estate.

"6th. I give, devise and bequeath to my son Wilbert N. Keener the sum of $1500 in cash. This amount of cash with the real estate I have this day deeded to him will equal his share of my estate.

"7th. I give, devise and bequeath to my son Charles H. Keener the sum of one dollar in cash. This amount of cash with the real estate I have deeded to him this day will equal his share of my estate.

"8th. I give, devise and bequeath to my son William E. Keener the sum of one dollar in cash. This sum of cash with the real estate I have deeded to him this day will equal his share of my estate.

"9th. I give, devise and bequeath to my daughter Maria L. Ray the sum of $400 in cash. This sum of cash with sums of cash I have heretofore advanced her will equal her share of my estate.

"10th. It is my will that when I shall have departed this life, and all debts and funeral expenses shall have been paid, should there be a residue after all bequests shall have been paid, then my son Wilbert N. Keener, is to have $200 in cash in addition to the $1500 mentioned in paragraph six of this will.

"11th. Should the residue mentioned in the preceding paragraph exceed the sum of $200, it is my will that the remainder shall be,divided equally between my sons Wilbert N. Keener and Charles H. Keener, and my daughter Samantha J. Walker..

"Lastly. I make, constitute and appoint Wilbert N. Keener and Charles H. Keener, without bond, to be executors of this, my last will and testament, hereby revoking all former wills by me made.

"In witness whereof, I have hereunto subscribed my name and affixed my seal, the thirtieth day of June, in the year of our Lord one thousand nine hundred thirteen.

<div style="text-align:center">"Elias Keener.          (SEAL)" .</div>

The will is attested by Bert Webb and John M. L. Gore, and admitted to probate December 30, 1918.

The four deeds, respectively, conveyed to Charles H. Keener, 85 acres and one-half of two lots in Carthage; to Wilbert N. Keener, one-half of the two lots in Carthage; to Mrs. Walker, 80 acres; to William E. Keener, ".during his life time only and at his death the land is to go to his offspring, share and share alike," 165 acres; all the land conveyed being in Jasper County. This land was worth about $100 per acre in June, 1913, except the ten acres of timber, worth from $25 to $30 per acre. The two lots in Carthage were worth $2,200. The inventory and appraisement show certificates of deposit in banks and good accounts $9,130.12; other personal property, not including household and kitchen furniture, $326.

Dr. Baker testified for the plaintiff that in 1909 Keener's body and mind were both feeble. He would be led more or less whether he liked the persons or disliked them; whether they would be fair or unfair. He was below par physically and mentally.

Everett Brummett, a neighbor, had known Keener all his life; after his stroke of paralysis he couldn't carry on a conversation, couldn't hold a subject long at a time; would turn off and talk about something else. Before his stroke of paralysis, sometimes he would and sometimes he wouldn't know me; he would remember at the time who I was, but afterwards forget who I was while I was talking to him. Condition worse after this paralysis. He never regained mentally to carry on a conversation while I knew him; couldn't hardly get around. Saw him frequently in 1916; couldn't carry on a conversation. His condition was about the same in 1913. I put some horses in his pasture. Four months later I went to get them; he didn't know me. I told him I came to get the horses and asked him what the bill was, and he didn't seem to know and I called Mrs. Walker and she figured it up and I gave him the money. Think he could go around over the place. I built fence for him in 1907 or 1908. I could always understand him till he had that stroke. After that it was difficult to understand him.

Walter Miller, a neighbor, testified: He was getting weak, feeble and childish two or three years before his stroke of paralysis in 1910; after that his condition, physically and mentally, grew worse; he would forget, his mind would leave him and come back, clear up and go off again. I was at his place a number of times in 1912 and 1913. I husked corn there in the winter of 1911 and 1912. We divided the corn. The Church boys took two loads, and I put Keener's load in his crib. When we finished he said we owed him a load of corn, which we didn't. We couldn't make him believe any other way, and the boys said rather than have him believe that way they would leave him another load, and they did. I had no interest, but watched the loads. I lived close to him all my life and saw him quite often, and would stop and talk with him when he was in sight. I understood him. He would forget lots of times who I was. I would tell him, and he would talk for a while and then forget what we were talking about and talk about something else. In

my opinion, based on my acquaintance with him, he was of unsound mind on June 30, 1913. He was really right intelligent for a man of his age most of the time, and part of the time he wasn't.

John Daugherty, neighbor to Keener all his life, saw him frequently; couldn't understand him after his stroke; had a colt and five calves on his pasture in 1912; bill was four or five dollars. Keener couldn't figure it up in his mind, and got Mrs. Walker to do it. I have seen him settling up for wheat he hauled and stuff like that. His mind was unsound in 1912.

Sid Bowers, a merchant at Carthage testified: Have known Keener since I was six or eight years old; he traded at our store. Before 1910 he was a little forgetful; after his stroke he hardly ever came to town; couldn't talk well; couldn't hardly understand him from that time till he died. Mrs. Walker transacted his business mostly. I called at his house after his stroke and tried to visit with him. He was very feeble; his mind wandered. I don't think he understood what he was talking about. Of course, I would have to side in with him. Mrs. Walker looked after him. I was at his house probably two or three times a year. Won't say I was there in 1913.

Isaac Jacobs, neighbor, knew Keener since 1874, forty-four years. After his stroke in 1910 I would stop in, maybe, a couple of times a year to see how he was. Sometimes he knew me and sometimes he didn't; sometimes he would be asleep and they wouldn't waken him; always difficult to converse with him, like any old man. He would answer questions when awake. I think his eyesight was poor, little hard of hearing. Never tried to do business with him.

Charlie Church: My father died in Iowa in 1888. Grandfather came, settled up father's business and moved us to his house in Missouri. My mother did all his housework, cooking and washing for him and his hired men, until we moved to ourselves ninteen or twenty years ago on her farm, a mile and a half from grandfather's. My brother and I worked on the farm as we got old enough.

He always seemed like a father to me. He visited us every few days; seemed interested in us; warmest kind of feeling for the whole family—that included Florence. After she married, she and her husband came to our place occasionally. Grandfather would get offended if they didn't come to see him; wanted to know if they didn't have time to visit him. Grandfather and Mrs. Ray were friendly, as far as I know. I used to farm his ground; he would get a letter from her; he wanted it read or tell us something, hearing from Lou (Mrs. Ray). In first half of 1910, he was getting feeble and childish. Eight or ten years before 1910, he frequently had sick spells. Mrs. Walker, my aunt, waited on him. After his stroke of paralysis in 1910, for some days he couldn't speak a word, helpless, and just like a child for I don't know how long. Had a field of wheat on his place in 1913. We threshed the wheat and put his part in the bin. He didn't look after his part; he couldn't. Mrs. Walker generally looked after it. After June, 1913, his condition gradually grew worse. During those years his memory was awful poor. At times I would be talking to him and he would be sitting in a chair and he would fall asleep. I figured a pasture bill for him in 1912 or 1913. He tried to figure it in his head and couldn't. He said he used to figure such little bills in his head and he said for me to figure it. In 1910, after the stroke of paralysis, Miller helped us gather corn. Grandpa got his head set he was a load short. We tried to convince him, and the longer we talked the worse he got irritated, and we gave him a load to pacify, satisfy him. He was physically weak, worn out; his mind was the same way. My sister Florence was eighteen or nineteen when grandma died in 1904. Mrs. Walker moved there with grandpa several years before we moved away. I think he knew his children and grandchildren.

Elmer Tinder: Married Florence Church in January, 1906. When we would go to Mr. Keener's after his stroke he wouldn't know us. They would tell him who we were, and pretty near from that time when we would go there he wouldn't know us unless I got right close. I couldn't

understand him good unless I knew what he was talking about. Mrs. Walker was always there and would explain if I couldn't understand. He was always glad to see us, treated us well and asked us back. He made no advancements to my wife since I knew her. She died in July, 1918, and left two girls, now ten and thirteen. He thought Mrs. Ray was all right, and complained of her being sick and said he felt sorry for her. He called her Lou. He gave my wife $25 in his will. Sometimes after he was paralyzed, after I would find out what he was talking about, I could understand him.

Mrs. Ray, the plaintiff, testified: Live In Kearney County, Kansas; youngest child of Elias Keener; married in 1893; we bought sixty acres in Butler County, and moved there in 1901. Early in 1902 father sent me a draft for $200 and another for $75 to pay a hospital bill; in 1903, a draft for $600 to pay on an $800 mortgage. After I got well I came to see father and he gave me another draft for $200 to finish paying off the mortgage. That made $1075, all I received, except two or three times, when I came home, he gave me a few dollars to pay my fare home. I got no furniture; mother gave me a second hand old piano, a dresser, rocking chair, stand table, wooden bedstead, rag carpet and old sewing machine, a heifer, an old cow, worth $15 or $16 a piece, and a colt father bought at a sale for $20. Mother died in 1895. I have one child. I had asthma, and had to go to the mountains in Colorado about three years. I was back here a month in 1910, after father was paralyzed. He was feeble physically and mentally. I couldn't understand much he said; he wasn't the same man I had formerly known by a good deal. His mind wasn't sound. I was notified of my father's death by the undertaker. I came here last October, and stopped with the Church boys. Not one of my brothers or sister called on me or invited me to their home.

There was other evidence as to the testator's physical and mental condition on the part of the plaintiff, but this will show the general tenor. Beginning with 1910, Mrs. Walker transacted her father's business at the

bank, indorsing his certificates of deposit, taking new ones and the like.

For the defendants, Ed Taylor and others testified that they had dealings with Mr. Keener from 1913 until near his death. He was able to transact business. Taylor always had trouble talking with him.

W. N. Keener, aged 65, testified his father told him he wanted to make a will; asked who would be a good man to write it. Witness suggested Mr. Webb, who lived at Jasper, eleven miles away, and his father told him to get him.

He and his brothers were in the dooryard when the will was written. Mrs. Walker was in the kitchen getting dinner. Neither ever talked with their father about his will. Webb brought Gore with him. The sons knew nothing about the deeds or what was in the will until the day after the funeral. W. N. Keener worked at home till 1882, when his father gave him $1200 or $1500 to pay on some land; gave him a team in 1881.

Charles Keener, aged 62: Father bought an eighty for me, helped buy it, when I was twenty-one; land right west of it worth $100 per acre. Father sold some cattle and hogs after his stroke in 1910. The last wheat I hauled for him was in 1918. He always knew me.

Wm. E. Keener, aged 57: I lived on my sister's forty adjoining father's farm for twenty years until 1917, when I moved in with father, with my children. He directed his own business. I farmed the biggest part of father's place. From 1910 till father's death, Charlie, Newt and Mrs. Walker did his work. He worked more or less every day during the summer, kept his garden clean. His wheat was hauled to market. Of course, he couldn't count the pasture rent up; it was a mixed up affair, I doubt if one man in fifty could do that.

Mrs. Walker, aged seventy: Widow twenty-six years, no children. Lived with father since in 1893. Mrs. Church and her children were living there then. Mrs. Ray was married and gone. Webb and Gore and father were in the front room by themselves. They called for father's deeds and I got them. I had dinner about ready

when they completed their work. When the deeds and will were written, I put them in an envelope. Father said: "You take these papers and put them away and keep them until I am gone and then I want you to give them to Charlie and Newt, my executors," and I did it. I put them in my trunk and locked them up. I never said anything to any one until my father was dead and buried, and, then told my brothers father had made a will and I wanted them to come back there and read it, and I got the will and handed it to Charlie and Newt, and they opened it. Father told me afterwards what he gave to this one and that one. He didn't tell me all of them, but he told me what he gave to William. He said, "I don't think they will ever have anything. It seems like they don't know enough to make a living. This may save them from the pen or jail. I never helped him to get any land." I never saw my father one hour out of his mind. His mind was sound a half hour before he died, as it was in 1910, 1908 or 1906. "Q. You had entire charge of everything? You looked after and nursed and took care of him? A. I tried to." I understood father could have asked me for those deeds any day and it would have been my duty to have turned them back to him. He could have destroyed them and the will or done anything else with his property. The deeds would have been under his control if he had called for them. He could have had my deed at any time. "Q. That was your understanding? A. He never said anything about it." He never explained why he cut Florence Tinder off with $25. One time he said he had some trouble with her. She wouldn't treat her mother right. He told Florence if she would mind and do what he wanted her to, he would help her and she told him she didn't want any of his help. She was staying at her brother's. He wanted her to stay there. She wouldn't do it. He could do nothing with her. I am telling what father said. That was before she was married. He always felt friendly toward them and wanted Florence and her husband and little children to visit him.

The appellants assign for error the giving of the instruction directing the jury to return a verdict sustaining the will in controversy.

I.  As to the execution of the will: "Every will shall be in writing, signed by the testator, or by some person by his direction, in his presence; and shall be attested by two or more competent witnesses, subscribing their names to the will in the presence of the testator." [Sec. 507, R. S. 1919.]

**Attestation.**

This statute is mandatory.  The two attesting witnesses must subscribe their names in the presence of the testator, attesting the fact that he did sign his name to the instrument as his will.

In Cravens v. Faulconer, 28 Mo. 19, 21, RICHARDSON, J., said:

"The witnesses must subscribe their names in the presence of the testator in order that they may not impose a different will on him, but it is not necessary that they shall attest the very act and factum of signing by the testator.  Though he must do some act declaring it to be his will, no particular form of words is required; and it is uniformly held that it is not necessary that the testator shall actually sign his name to the will in the presence of the attesting witnesses; but the acknowledgment by the testator that the name signed to the instrument is his, or that the paper is his will, is sufficient."

The testator must know he is signing his will and he must know that the subscribing witnesses are attesting his signature thereto as his will.  He must in some manner request their signatures.  [Bingaman v. Hannah, 270 Mo. 612, 626; 40 Cyc. 1115.]

The evidence is that the will was read to Mr. Keener and he said it was all right.  Webb testified that Keener signed it in the presence of himself and Gore, and that they signed it in Keener's presence.  If this were corroborated by Gore, the jury might find from the circumstances that Keener understood the instrument, signed it as his will and requested the witnesses to attest it as such.

Mr. Gore testified he was present while the will was being written and was a witness to it. He does not testify that Keener signed the will in his presence or acknowledged the signature thereto to be his, or that he signed it as a witness in the presence or with the knowledge and at the request of the testator. A will must be attested by two witnesses, or it cannot be admitted to probate. The court's instruction, in the face of much evidence to the contrary, assumed that the will was executed by one having testamentary capacity, in the presence of two witnesses and that they attested in his presence and at his request. We think this was error.

II. In the consideration of this case we must treat it from the standpoint of the plaintiff's evidence, aided as it may be by the defendants' evidence. It has been said that a good rule for testing the mental capacity of a person to do an act requiring mental comprehension and disposing judgment is to have the testator repeat from memory the mode in which he has disposed of the bulk of his property. [Redfield on Wills (4 Ed.) 87 (5).] If memory ceases to function there is an absence of testamentary capacity. The test may as well be applied to the ordinary affairs of life. If one cannot recall or comprehend what he has done for, or the obligations he morally owes to, the natural objects of his bounty, he cannot be said to have testamentary capacity.

Mr. Keener did not manifest a purpose to disinherit in whole or in part either of his surviving sons or daughters. On the contrary, the will purports to make an equal distribution of his property between them after the payment of certain legacies. His estate was worth about $38,000. He cherished a sincere affection for all his children and grandchildren. Clause nine of the will recites that the $400 given Mrs. Ray, with the cash theretofore advanced, equaled her share of the estate. Mr. Gore testified that Keener said Mrs. Ray "should not have anything at his death as he thought she had received her share of his estate by the money he sent" to pay her

*(margin note: Testamentary Capacity: Memory.)*

hospital bill. The uncontradicted evidence is that he gave her checks for $275 for that purpose. The total sum advanced was $1075, not to mention some property of little value she received at her marriage. The hospital bill was all he had in mind at the time he made his will, if we accept Mr. Gore's evidence. That, with the special bequest of $400, in his judgment, gave her an equal share of his estate. Mr. Keener either had no recollection of the money he had advanced to Mrs. Ray, or he had no intelligent comprehension of the value of his estate. Did he have sufficient mind and memory to comprehend the testamentary act in which he was engaged? He gave to his son William one dollar. "This sum of cash with the real estate I have deeded to him this day will equal his share of my estate." The 165 acres deeded to his son William was shown to be of the value of over $16,000 in June, 1913.

The pittance of $25 given to his granddaughter Mrs. Tinder clearly shows his purpose to disinherit her. This he had the clear right to do, if of sound mind, no matter how unnatural or discreditable it may have been. The gift of $900 to each of his grandsons shows it was not his intention to give them an equal distribution. These considerations emphasize the significance of the statement that $400 given Mrs. Ray, with the cash theretofore advanced, equaled her share of the estate. The purpose of the testator as shown by the will was to make an equal distribution.

When the whole will is read, it shows the purpose of the testator was to disinherit his granddaughter, to give his grandsons some substantial help, a mere fraction of his estate, and then, advancements considered, to make an equal distribution of the residue of his estate between his surviving sons and daughters. The gross inequality of their distributive shares is palpable. If this disparity was due either to failure of memory or to inability to comprehend the nature and value of his estate, it established testamentary incapacity.

"Excessive failure of memory invalidates. A will made by a testator of great age and impaired mind and

memory, however, ought not to be sustained, unless it appears that the disposition emanated from free will, without the interposition of others, and accorded with intentions previously expressed or implied from family relations. And failure of memory which includes the testator's estate and the objects of his bounty establishes incapacity.

"And senile dread of relatives. It is also to be observed that a party in extreme old age may fall under the subjection of relatives or attendants to such an extent as to deprive him of freedom of volition. His mind may be quite intelligent, his understanding of business clear, his competency to converse upon and transact (business) undoubted, and his bodily strength good; but there may grow upon him such a fear and dread of relatives or servants who may have surrounded him, and on whom he may have become perfectly dependent, so that his nervous system is wholly overcome, and he has no power to exert his mind in opposition to their wishes, or to resist their importunities. His mind is enslaved by his fears and a feeling of helplessness, so that, to that extent, and in matters in which he may be moved by them, he really is facile and imbecile. This state of things seems to be easily brought on in old age, when the faculties are otherwise entire, and the bodily strength considerable." [1 Wharton & S. Med. Juris. (5 Ed.) p. 129, pars. 126, 127.]

In Byrne v. Fulkerson, 254 Mo. 97, 120, James T. Blair, C., now Chief Justice, said:

"With respect to the test to be applied in determining testamentary capacity this court recently said: 'To have mind and memory enough to make a will, testator should be able at the time to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons who were the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all these facts in his mind, without the aid of others, long enough to have his will made. Otherwise the law takes

from him power to dispose of his property by will. A mind not coming up to that standard is not a testamentary one. [Crum v. Crum, 231 Mo. l. c. 638 et seq. and cases cited; Holton v. Cochran, 208 Mo. 314; Roberts v. Bartlett, 190 Mo. l. c. 699; Meier v. Buchter, 197 Mo. 68.]

" 'Whatever the cause may be, if the mind of the testator does not measure up to the standard fixed by this rule, he is incapable of making a will. It is neither true that every weakness incident to age and disease incapacitates a man for making a will, nor is it true that a lack of testamentary capacity is any less fatal to the legal power to make a will because it is the result of these things. *Senile dementia* begins gradually, is progressive in character and in its advanced stages "the brain is well-nigh stripped of its functions." The difficulty lies in determining the point at which in its progress it has so impaired the faculties that they fall below the mark of legal capacity. [Bensberg v. Washington University, 251 Mo. l. c. 658.] Of this affliction learned authors say that it begins, as a rule, so gradually that its boundary line cannot be fixed. It is marked by progressive decay of the mental faculties, of which memory is one of the first to fail; and the loss of memory is at first more marked for recent than for remote events. The instincts and affections change, the tastes alter, and the sense of delicacy often suffers. In the purely intellectual sphere we observe an impaired judgment and a weakened power of attention. There is apathy, indifference to current events, and a disposition to be interested in trifles. The emotions become unstable. Some of these patients are irritable, easily excited, prone to weep easily and without much apparent cause. . . . A not unusual form of *senile dementia* is a type of delusional insanity. In advanced cases, especially, in which all the mental and moral faculties are clouded, delusions are observed. These delusions are usually of a depressive or persecutory kind; a common one is the idea of loss of property, or of being robbed.' [1 Wharton & Stille's Medical Jurisprudence, secs. 975, 976.]

"In the same connection the same authors say: 'In advanced *senile dementia* the brain is well-nigh stripped of its functions. Nothing can exceed the completeness with which this reduction is sometimes effected in old age, unless it be in general paresis; and, in fact, the terminal stages in the two conditions are not unlike. The patient's mind is indeed "sans everything." ' [Id. sec. 979.]

"After a careful examination of the evidence in this case the conclusion has been reached that the evidence was sufficient to require the submission to the jury of the issue as to testamentary capacity. The question now is not what conclusion this court might reach on the facts in the record, nor what conclusion this court might think the jury ought to reach, but merely whether there is evidence in the record which, if the jury chose to believe it, would support a verdict for contestant."

III. In the consideration of the question of undue influence and testamentary incapacity, the relation of the testator to the objects of his bounty, the provisions of the will, its recitations and all the environments and circumstances of the case are to be considered by the jury. For years Mr. Keener had been constantly surrounded by the chief beneficiaries. He had for years been dependent upon them for the transaction of his business and for personal attention. If the silver cord were not "loosed or the golden bowl broken or the pitcher broken at the fountain, or the wheel broken at the cistern," surely the "evil days" had come, "when the keepers of the house shall tremble and the strong men shall bow themselves and the grinders cease because they are few, and those that look out of the windows be darkened and the doors shall be shut in the streets when the sound of the grinding is low." The decrepitude and infirmities of great age had come upon him. Insensibly he would be prone to lean upon those about him on whom he had become dependent. There was extreme mental and physical weakness which would be an inviting field for undue influence. For some reason his affections had changed. The earmarks of undue influence are present.

<!-- margin note: Undue Influence. -->

Ray v. Walker.

Why did these sons and daughters studiously absent themselves while the deeds and will were drawn? Why did the notary bring blank deeds, when, according to the evidence, he was simply requested to write a will? He was a mere casual acquaintance. Other old acquaintances could converse with the testator with great difficulty, yet, without any prompting, Mr. Keener gave clear and explicit directions; the business was promptly dispatched and the will recites that each of the five sons and daughters received equal shares. Does not this suggest a program, prearranged by a master mind before the notary arrived, and unknown to him? Why the studious concealment of the execution of the deeds for more than five years? A jury might conclude they protested over much their ignorance, innocence and non-participation in the business. It smacks of a previously arranged program, of which undoubtedly Mr. Webb had no intimation. In Mowry v. Norman, 204 Mo. 173, 192, GRAVES, J., said:

"But the case at bar is much stronger. The plaintiffs do not rest solely upon the presumption, but there are at least some facts tending to show undue influence in addition. We have the peculiar circumstances of the will being executed while the testator's old wife was absent upon a visit; a previous will of like tenor had been made, so defendant says, yet although he knew of it, not a word was breathed to his mother. The last witness to this previous will had but recently died; the inequality of the will itself; the peculiar expression in the first part thereof, to the effect, 'I, Wesley Norman, . . being of sound mind and free from all undue influences,' etc.,—all these things point to a master mind, not the enfeebled mind of the decrepit testator. What testator before was ever so cautious as to proclaim to the world that he was 'free from all undue influences?' To our mind, if there were not other earmarks, we have in this expression enough to cast suspicion upon this instrument, and to cast suspicion upon some of the testimony for defendant. It is true that at the time of the execution of the will, in the absence of the old and loving wife, the defendant was conspicuous for his absence. This

conspicuous absence, taken with the language above quoted, may indicate something. Discussing this in the case of Bradford v. Blossom, supra, BURGESS, J., said: 'When Mrs. Bradford went to execute the will he took her to Mr. Thompson's office, introduced her to him, then withdrew until the will was executed by her, when he returned, and he and Mrs. Bradford left together. It seems somewhat strange that after Mr. Blossom took Mrs. Bradford to Mr. Thompson's office to execute the will, he should have retired therefrom while she was executing it, and, after she had done so, return for her, unless it was to avoid any suspicion that might be occasioned by his presence when she signed the will, that she was executing the same by reason of his undue influence over her.'

"Upon the question of mental incapacity the evidence is meager and not strong, but in our judgment there is evidence sufficient upon which to take the judgment of the jury as to the question of undue influence. Undue influence need not be proven by direct and positive testimony, but it is sufficient if it is shown by, or can be inferred from, the facts and circumstances in evidence. [Roberts v. Bartlett, 190 Mo. 1. c. 700-1; Bradford v. Blossom, 190 Mo. 1. c. 139; Rood on Wills, sec. 190.]

"Nor is it required that the overt acts of undue influence were exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testator had been acquired previously and did operate at the time of making the will in the disposition of the testator's property. [Taylor v. Wilburn, 20 Mo. 310; 1 Underhill on Wills, pp. 187-8.] Whilst the case is not as strong for plaintiffs as might be wished by them, yet in our judgment there was error in refusing to submit the case to the jury on the question of undue influence. The judgment will be reversed and cause remanded."

IV.  Mr. Keener during his long life cherished affection for his children and grandchildren. No doubt the loss of his wife strengthened his attachment for them.

The illness of Mrs. Ray appealed to him, aroused his solicitude and elicited prompt assistance. This was followed by the payment of the mortgage on her little farm. He took great interest in his grandchildren and was fond of Florence and her children. Where is the grandfather who would deny the soft impeachment? Yet, somehow, this old man in his dotage came to believe that this paltry sum he paid for Mrs. Ray's hospital bill had swelled to such proportions that it, with $400 given by the will, equaled her share in his estate. Did any one suggest the idea? And then it seems that when Florence was a young girl, living with her brothers, her grandfather was offended because she declined to live with him. But according to Mrs. Walker he was fond of Florence, her children and her husband to the end. Did any one recall this apparently forgotten incident to Mr. Keener? Or was it a delusion?

*Changing Affection.*

In 1 Wharton & Stille's Medical Jurisprudence (5 Ed.) sec. 97, speaking of questions for the jury, it is said: "And so is the question whether a prejudice against a natural object of the testator's bounty is evidence of derangement or not."

V.  The evidence shows that the first information Mrs. Ray received of her father's death was a telegram from the undertaker. The first letter Mrs. Ray received from Mrs. Walker was about nine weeks later. In this Mrs. Walker told her of some of the provisions of the will, and insisted that she take the $400. She further said: "He also had lots of trouble with his kidneys; has had for a long while; he set on the chamber ten or fifteen minutes. Father kept his mind to the very last. Father was just wore out. Lou, I miss father." Two months later she again wrote Mrs. Ray, insisting that she write for her money.

*Poisoning Testator's Mind.*

She and her brothers ignored Mrs. Ray when the latter returned to the neighborhood. If they had any affection for their sister, it was of the quality that is kept on ice. In this arctic atmosphere, Keener's affection for his daughter was chilled. An attempt was made to

conceal this by the pretense of an equal distribution. This is what the jury might have found from the evidence.

VI. Under the rulings of this court it may be a close question if there was a confidential relation existing between the testator and Mrs. Walker and her brothers, especially in view of Mr. Keener's great age and infirmities. In the concurring opinion of GRAVES, J., in Kuehn v. Ritter, 233 S. W. 5, 8, in which I concur, it is said:

**Explanation of Unnatural Provisions.**

"My learned brother in his statement of the case says: 'The will was made on the 23d of May, 1916, in the testator's eighty-fourth year, while he was feeble in mind and body by reason of the inroads of hardening of the arteries, Bright's disease, and senile dementia, and while he was living at the home of the defendant, where all his physical wants were ministered to by her, and *in addition she attended to his business and personal affairs.'*

"The italics are ours, and this italicized portion of the statement of facts makes a case of fiduciary relation. [Mowry v. Norman, 204 Mo. 189, 103 S. W. 15, and 223 Mo. 476, 122 S. W. 724.] The Mowry Case was here twice, and the facts in that case were much like this case as to the son and father. The father lived with the son, and his wants were looked after by the son, and in addition the son attended to the business of the father. This last fact, we ruled, created a fiduciary or confidential relation. So in this case, the mere fact that the parties were father and daughter does not preclude the idea that there was a confidential or fiduciary relationship between them." [Citing cases.]

JAMES T. BLAIR, now Chief Justice, concurred in that opinion in Division One. But laying that phase of the case aside, the unjust and unnatural provisions of the will call for explanation on the part of proponents. In Meier v. Buchter, 197 Mo. 68, 87, 94 S. W. 883, LAMM, J., delivering the opinion of the court in Division One, said:

Ray v. Walker.

"However, when all this has been said it still remains that, as long as kindness is esteemed a virtue by civilized people, their laws can neither be interpreted as essentially unkind, nor are they of such a sour complexion and so deadly cold in their processes as to eliminate all human warmth of sentiment and all moral duty. Accordingly, it is the sound doctrine of the law that, while a testator has the abstract power of disposing of this estate by will according to his settled convictions, or caprice, yet a will, producing results such as those now under judicial scrutiny, is the object of sharp solicitude and jealousy in the courts. When one of old, by subtlety, took from his brother his father's blessing and the wronged one was told thereof by his father, it is said: And when Esau heard the words of his father, he cried with a great and exceeding bitter cry, and said unto his father, Bless me, even me also, oh my father. Peradventure the law may utter for this child a cry for a blessing which her dumb lips may not utter. We think it does; because, such a will, where there is other substantial evidence of undue influence and testamentary incapacity, calls for explanation, and such unnatural provisions are submitted to the jury as evidence tending to show undue influence, where that is in issue, and as evidence tending to show lack of testamentary capacity, where that is in issue, and may be considered by the jury with all other facts and circumstances in the case upon such issues. That is to say, an unnatural disposition of property standing alone may not avoid a will, but the results of such unhappy distribution may be tempered and toned down, possibly to avoidance, by allowing it to be weighed by the triers of facts, along with other facts, tending to show undue influence or testamentary incapacity.

"The general rule applicable to such conditions is formulated by Schouler on Wills (3 Ed.) sec. 77, thus:

"'Notwithstanding the broad principle which maintains testamentary capacity, it is generally found in practice that a will which is partial and unjust in its provisions, absurd, or clearly devoid of natural duty and affection, finds no ready support in the courts. Such

wills are not, indeed, absolutely' void; but their execution is regarded with jealousy and suspicion. The spiritual tribunals in early times, following the Roman law of inofficious testaments, made little compunction of setting senseless wills aside, or, as Swinburne very strongly expressed it, "if there be but one word sounding to folly." Foolish words, foolish phrases, cannot in these days, however, be said to invalidate any will at the Anglo-Saxon law; . . . but the English law does not follow the Roman in avoiding such wills peremptorily as the offspring of incapacity, nor even so as to prevent one absolutely from disinheriting his own offspring. On the contrary, if a testator be legally competent to make his will, and acts freely, his will cannot be impeached because harsh, unequal, unreasonable, imprudent or unaccountable in its provisions; nor as being a foolish or visionary disposition; nor even as being devoid of natural affection and moral duty. It may be that what on the face of the will appears an unnatural disposition, may be reasonably explained. And certainly the more distant or unfamiliar one's heirs and next of kin, the less should he be expected to provide for them, equally or at all, by his testament.

" 'But in order to sustain unjust, unnatural, or absurd will, which may be contested, fair proof at least should be afforded that the testator was of sufficient capacity at the date of execution to comprehend its import; and furthermore the trier of the case should believe that neither essential mistake on his part nor fraud nor undue influence of others about him produced so unhappy a disposition. . . . In fine, a harsh and unnatural disposition by the will in question, is a circumstance which tends to discredit the maker's testamentary capacity.' (See, for the same doctrine, 1 Underhill on Wills, sec. 105.)

"In a very late work, Page on Wills, sec. 385, it is said:

" 'Under the civil law a will whereby the testator without just cause excluded from his estate those who were near to him in blood, as where a parent disinherited

a child, or a child excluded a parent, was known as an inofficious will, and might be set aside by a form of contest known as *querela inofficiosi testamenti*.   But the common law recognizes no such limitation upon the testamentary power of a testator who possesses testamentary capacity. . . . .   However, the nature of the will itself is clearly one of the controlling facts in passing upon doubtful testamentary capacity.   Popular feeling upon this point coincides with the rules of law, and the jury or the court which decides upon the facts must be allowed to consider the nature of the will in connection with the other evidence in the case.'   [Citing Aylward v. Briggs, 145 Mo. 604.]  . . .   'If the will is unjust and unreasonable in view of the relations of the parties, this fact may be shown by proper evidence, and may be considered by the jury as bearing upon testator's capacity.'

"In Redfield on Wills (4 Ed.) p. 516, it is said:

" 'Where the will is unreasonable in its provisions, and inconsistent with the duties of the testator, with reference to his property and family, . . .   this of itself will impose upon those claiming under the instrument, the necessity of giving some reasonable explanation of the unnatural character of the will.'   On p. 537: 'Gross inequality in the disposition of the instrument, where no reason for it is suggested, either in the will, or otherwise, may change the burden, and require explanation on the part of those who support the will, to induce the belief that it was the free and deliberate offspring of a rational, self-poised, and clearly disposing mind.'   The above text has been frequently cited with approval by this court, e. g., in Gay v. Gillilan, 92 Mo. 264; McFadin v. Catron, 120 Mo. 271.

"In 28 Am. & Eng. Ency. Law (2 Ed.) 106-7, the rule is formulated as follows:  'The character of the provisions, however, as being just or unjust, reasonable or unreasonable, may be considered by the jury, as tending to throw light on the capacity of the testator.   Evidence is therefore admissible tending to throw light on the question of the justice or reasonableness of the will.

Such evidence usually relates to the relative situations and needs of those having a claim on the testator's bounty, and to the relations between the testator and those receiving or claiming to have been unfairly deprived of his bounty.'

"And in the 29th volume of the work last cited, pp. 115-16, it is said: 'Evidence that the provisions of a will are unreasonable, unjust, capricious, and unnatural is not sufficient in itself to establish undue influence (citing Campbell v. Carlisle, 162 Mo. 634); but it is proper to be considered along with other evidence as going to show such influence (citing Gay v. Gillilan, 92 Mo. 250), . . and for the purpose of setting out more clearly the unnaturalness of the will it may be shown that relations between the testator and the relatives not provided for were pleasant, or that the latter was dependent for support on the former.' "

From a careful examination of the record, we are of the opinion that there was substantial evidence of undue influence and of testamentary incapacity on the part of testator. The weight and credibility of the evidence, however, are matters for the jury.

VII. The evidence of Mrs. Walker is that she put the deeds and the will in an envelope and that her father told her to "put them away and keep them until I am gone, and then I want you to give them to Charlie and Newt, my executors." It seems from her evidence that she accepted these deeds and will with the understanding (not expressed) that her father could recall them at any time; in other words, that her father had not parted with control over the deeds.

**Delivery of Deeds.**

"The act must have been with the intent on the part of the grantor to divest himself of title and it must have been accepted by the grantee with the intent to take the title as indicated in the deed. These two acts are essential to a complete delivery of the deed. Bunn v. Stuart, 183 Mo. 375, 383, and on p. 384, quoting from Mudd v. Dillion, 166 Mo. l. c. 119: "There must be a

time when the grantor parts with his dominion over the deed, else it can never have been delivered. So long as it is in the hands of a depositary, subject to be recalled by the grantor at any time, the grantee has no right to it, and can acquire none.'' [Meredith v. Meredith, 229 S. W. 179, 181.]

It is clear from the testimony of Mrs. Walker that her acceptance of the deeds was with the understanding on her part that she took them for safe-keeping, subject to the right of her father to recall them at any time. This view is strengthened by the further consideration that she was not to deliver them to the grantees, but to her father's executors, his personal representatives. If, however, the delivery was with the intention on the part of the grantor to part with all dominion over the deeds and Mrs. Walker accepted them with that understanding, the intent might well be inferred that she was to deliver them to the executors for the use of the grantees. [18 C. J. 205, (101).]

VIII. These deeds and the will were executed simultaneously. There is no question about the identity of the deeds. They were in existence at the time the will was executed. Each deed is referred to

**Deeds Made Part of Will.** in the will as having been made on that day. They were, therefore, incorporated in and made part and parcel of the will, and become operative upon the probate of the will. [White v. Reading 293 Mo. 247.]

For the reasons above indicated, the judgment is reversed and the cause remanded. All concur; *Walker, J.,* in all except Paragraph I.