IRENA MOWRY and MARY KETTERING, Appellants, v. MARION NORMAN.

Division One, May 29, 1907.

1. **WILL: Contest: Question for Jury.** Where there is substantial evidence to support either of the grounds stated in the petition for contesting the will, the issue becomes one for the determination of the jury, and not one to be determined by a peremptory instruction.

2. ———: **Undue Influence: Burden: Presumption.** If the contestants of the will show a state of facts which establish a fiduciary relation, or some such similar confidential relation, between the contestee, a principal beneficiary, and the testator, then the burden shifts to the contestee on the question of undue influence. Not only so, but that relation being established, the law indulges the presumption that undue influence was used.

3. ———: ———: ———: ———: **The Evidence.** An old man, feeble in body and mind, worth $16,000 in real estate, having a wife, two daughters and a son, was not in the actual use of the property or of a dollar, but lived with the son, who as agent or assumed guardian managed all his property, gave him what food and clothes he had to have, provided and paid for his physician, even purchased his tobacco, and in all things treated him as a child. By the will he gave all his property to this son, requiring him to care for his wife during her life. *Held*, that these facts were sufficient to show the confidential relation, and to cast the burden on the son to show that the will was not the result of undue influence, and the court was not authorized, upon that showing, to take the case from the

jury.  And although defendant may offer testimony to rebut the presumption, still the credibility of that testimony is for the jury.

4. ———: ———: **Suspicious Words.** The use of the words "being of sound mind and free from all undue influences" in the opening paragraph of the will, is enough to cast suspicion on the will.

5. ———: ———: **Evidence.** The will of an old, feeble and pliable man, which gave all his property to the son with whom he lived, was executed while his old and fond wife was absent from the State on a visit, and without the knowledge of his daughters, with whom his relations were friendly.  It was of like tenor to a previous will, whose attesting witnesses had previously died, the last one only shortly before.  The son knew of that will, but the wife never did.  The will was drawn by a lawyer who practiced in magistrates' courts and was the cashier of a bank, and was kept by him, and was not read by the son even when it was probated.  The son was not present when the will was drawn, and never inquired about it, although he testified his father had said he would will him the property if he would care for him and his wife.  It contained a recital that the testator was "free from all undue influences." *Held*, that all these things, when taken in connection with the fact that the son was a determined man, worth $30,000 in his own right, and the further fact that he had complete control of testator's property and had had for years, and gave to testator only such things as he chose to give him, were evidence of undue influence on the part of the son.

6. ———: ———: **Character of Proof.** Undue influence need not be proven by direct and positive evidence, but it may be inferred from or shown by the facts and circumstances in evidence.

7. ———: ———: **Exercised at the Time.** Nor is it necessary that the overt acts of undue influence should have been exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testator had been acquired previously and did operate at the time the will was made.

Appeal from Nodaway Circuit Court.—*Hon. Wm. C. Ellison*, Judge.

REVERSED AND REMANDED.

*J. B. Newman* and *John Kennish* for appellants.

(1) The burden of proving that testator was of sound mind, that is, of testamentary capacity, is on proponent of the will, throughout the trial. Norton v. Paxton, 110 Mo. 462; Jones v. Roberts, 37 Mo. App. 173. If there is any substantial evidence, direct or inferential, that testator was not of testamentary capacity, or that the pretended will was the result of undue influence, the case must go to the jury. Knapp v. Hanley, 108 Mo. App. 360; Charles v. Patch, 87 Mo. 463. (2) In this case there existed a close confidential relation between testator and the proponent, and the law "indulges the presumption that undue influence has been used." Campbell v. Carlisle, 162 Mo. 644; Hegney v. Head, 126 Mo. 627; Bradford v. Blossom, 190 Mo. 143; Roberts v. Bartlett, 190 Mo. 702; Dausman v. Rankin, 189 Mo. 708. One who has charge or general management of a testator's affairs, stands in a close and confidential relation to such testator, the same as an attorney, etc. 2 White & Tudor's Leading Cases in Equity, pt. II, p. 1187. The burden being on proponent by reason of the close confidential relation, he has the further burden of making an explanation of the unequal and unnatural provisions of the will. Maddox v. Maddox, 114 Mo. 49; Gay v. Gillilan, 92 Mo. 264. (3) In this case it was the province of the jury, under all the facts and circumstances in evidence, to pass upon the question of undue influence—as to whether the presumption of undue influence was removed by the evidence on the part of the respondent. King v. Gilson, 191 Mo. 327. The Supreme Court will not weigh evidence in a law case. Harrison v. Lakenan, 189 Mo. 609. Whether any witness in the case testified to the truth is a question for the jury. James v. Life Ass'n, 148 Mo. 15. "It is an invasion of the province of the jury for the court to direct them that they must accept

as true and act upon the evidence of witnesses.'' Dawson v. Wombles, 111 Mo. App. 540.

*W.W. Ramsay* and *L. C. Cook* for respondent.

(1) When the proponent made a prima-facie case by the examination of the attesting witnesses, and the introduction of the will in evidence, the burden of proof to sustain intestacy devolved upon contestants, and remained there until the close of the case; and unless they introduced substantial evidence, sustaining the charges that the will was not executed according to law, and that decedent was mentally incompetent to make a will, and that the will was the product of undue influence exercised by proponent, or at least to sustain one of these charges, then the peremptory instructions given by the court were correct. Riggin v. Westminster College, 160 Mo. 570; Crowson v. Crowson, 172 Mo. 691; Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Carl v. Gable, 120 Mo. 283; McFadin v. Catron, 138 Mo. 197; Fulbright v. Perry County, 145 Mo. 432; Sehr v. Lindeman, 153 Mo. 276; Tibbe v. Kamp, 154 Mo. 545; Lorts v. Wash, 175 Mo. 487; Schierbaum v. Schemme, 157 Mo. 1; Hughes v. Rader, 183 Mo. 704. (2) With the presumption in favor of testamentary capacity, there was no substantial evidence of want of such capacity, at the time of making the will, which would justify the court in allowing the case to go to the jury on that issue. Sehr v. Lindeman, 153 Mo. 203; Campbell v. Carlisle, 162 Mo. 634; Maddox v. Maddox, 114 Mo. 46; Crowson v. Crowson, 172 Mo. 691; Von de Veld v. Judy, 143 Mo. 637; Southworth v. Southworth, 173 Mo. 59; Crossan v. Crossan, 169 Mo. 161; Benoist v. Murrin, 58 Mo. 307; Cutlar v. Zollinger, 117 Mo. 101; Farmer v. Farmer, 129 Mo. 538; Hamon v. Hamon, 180 Mo. 685; Catholic University v. O'Brien, 181 Mo. 68. Nor did the fact that Wesley Norman during the last years of his life, and especially

during his last sickness, six years after the execution of the will, forget and miscall the name of his grandson, throw any light upon his mental condition at the time the will was written. Hamon v. Hamon, 180 Mo. 698; Van Alst v. Hunter, 5 Johns. Ch. 248. Nor will the court attach significance to the fact that testator was reticent concerning the execution of the will, and never mentioned it to contestants, or to his wife. Gibson v. Gibson, 24 Mo. 233; Sehr v. Lindeman, 153 Mo. 292; Cawthorn v. Haynes, 24 Mo. 238. (3) There was no substantial evidence tending to show undue influence. There is no fact or circumstance, act or word, done or said by proponent, or anyone else for him or in his presence, which supports or tends to support the charge of undue influence upon his part. Berberet v. Berberet, 131 Mo. 399; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Jackson v. Hardin, 83 Mo. 185; Doherty v. Gilmore, 136 Mo. 414; Carl v. Gable, 120 Mo. 283; Cash v. Lust, 142 Mo. 630; Aylward v. Briggs, 145 Mo. 604; Messmer v. Elliot, 184 Pa. St. 41; Sehr v. Lindeman, 153 Mo. 276. Such contractual relations as existed between proponent and his father in this case, instead of being fiduciary in their nature, and looked upon with suspicion and distrust, as appellants contend, are highly proper and trustworthy, and have been upheld and sustained by courts of equity in this State in the following cases: Halsa v. Halsa, 8 Mo. 303; Wright v. Tinsley, 30 Mo. 380; Gupton v. Gupton, 47 Mo. 37; Sutton v. Heydon, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Davis v. Hendricks, 99 Mo. 478; Healy v. Simpson, 113 Mo. 340; Teats v. Flanders, 118 Mo. 660; Brownlee v. Fenwick, 103 Mo. 420; Sitton v. Shipp, 65 Mo. 297; Berry v. Hartzell, 91 Mo. 132; Taylor v. Bonshrader, 107 Mo. 206; Veth v. Garth, 92 Mo. 97; Hager v. Hager, 71 Mo. 610; West v. Bundy, 78 Mo. 407; Hiatt v. Williams, 72

Mo. 214; Anderson v. Shockley, 82 Mo. 250; Nowack v. Berger, 133 Mo. 24; Anderson v. Scott, 94 Mo. 637; Hubbard v. Hubbard, 140 Mo. 300; Goodin v. Goodin, 172 Mo. 40; Kinney v. Murray, 170 Mo. 700; Steele v. Steele, 161 Mo. 566; McElvain v. McElvain, 171 Mo. 244; McKee v. Higbee, 180 Mo. 263; Lynn v. Hockaday, 162 Mo. 111; Asbury v. Hicklin, 181 Mo. 658; Grantham v. Gossett, 182 Mo. 651; Johnson v. Quarles, 46 Mo. 427; Brevator v. Creech, 186 Mo. 558; Rosenwald v. Middlebrook, 188 Mo. 58; Russell v. Sharp, 91 S. W. 134.

GRAVES, J.—Action in the Nodaway Circuit Court contesting the will of Wesley Norman, who died in Nodaway county, Missouri, April 25, 1904, aged seventy-nine years, leaving surviving him, a widow, aged about eighty years, and three children, two daughters, Irena Mowry and Mary Kettering, the plaintiffs in this action, and one son, Marion Norman, the defendant.

The property of Wesley Norman chiefly consisted of a farm of two hundred acres of the value of sixteen thousand dollars. Grounds of contest as alleged in the petition are mental incapacity and undue influence. Upon the close of the whole case, the trial court gave a peremptory instruction to the jury to find that the paper writing offered in evidence was the last will and testament of Wesley Norman, deceased. Verdict in accordance with said instruction, upon which verdict in appropriate terms judgment was entered. Perfecting their record by an unsuccessful motion for a new trial, the plaintiffs duly appealed to this court.

Under these circumstances a close review of the evidence for plaintiff will be required, for if they have substantial evidence upon either ground, it was a question for the jury and not the court. The will, omitting

the description of the real estate therein contained, is as follows:

"Be it remembered, that I, Wesley Norman, of the county of Nodaway, in the State of Missouri, being of sound mind and free from all undue influences, hereby revoking all former wills by me made, do make this my last will and testament in manner following, that is to say: I give, bequeath and devise my estate and property, real and personal as follows:

"First. I give and bequeath to my oldest daughter, Irena Mowry, the sum of one dollar.

"Second. I give and bequeath to my second daughter, Mary Kettering, the sum of one dollar.

"Third. I give, bequeath and devise to my only living son, Marion Norman, all the residue of my property of all kinds whatsoever, together with my real estate, described as follows, to-wit: [Description omitted], with this provision, that my aforesaid son, Marion Norman, is to take proper care and provide for my beloved wife, Mary Norman, her natural lifetime, should she survive me.

"Fifth. I hereby appoint and constitute my son, Marion Norman, the only and sole executor of this my last will and testament, without bond.

"In witness whereof, I have hereunto signed and sealed this instrument and published the same as and for my last will in said county of Nodaway and State of Missouri, on this 15th day of September, 1898."

By A. B. Talbott and C. H. Talbott, the two subscribing witnesses, the defendant made out the primafacie case, introduced the will and rested. From these witnesses it appears that it took three hours to produce the instrument in its present form — from nine a. m. until about noon. It also appears that C. H. Talbott, who drafted the will, practiced law in the justices' courts and had been cashier of a bank for several years, and he testified that the will was written by him with-

out a form book; that after it was executed it was given to him to keep, and he kept it until after the death of the testator; that he then notified Marion Norman that he had the will, but did not tell the wife or any other member of the family, although they were where he could have told them; that he never told Marion the contents of the will, but that when he told Marion that he had the will, he, Marion, said: "I hope he left the girls at least five hundred dollars each." That he went to Maryville with Marion to probate the will and that Marion did not then even read the will or ask its contents.

Upon the part of plaintiffs by their evidence in chief and cross-examination of defendant's witnesses it was shown that the testator, up to about the year 1880, resided in Illinois; that he had a farm there of about one hundred and twenty acres, which was bought largely upon credit, and was paid for by the joint efforts of testator and his father-in-law; that the two plaintiffs being older than the defendant, worked on the farm, in the field with their father, up to the time of their respective marriages which occurred when they had reached about the age of nineteen or twenty years; that he gave these daughters a few things, but exceedingly trivial in amount; that the Illinois farm was paid for before the defendant reached an age to be of any particular service upon the farm; that in or about 1880, testator sent the defendant to Missouri to look for a farm; that while here, visiting one of his sisters, then living in Nodaway county, he purchased the farm in dispute for his father, paying $26.50 per acre therefor; that some years prior to this, while yet in Illinois, the testator had fallen and sustained serious injury to his back; that for a long time he was unable to work and Mr. and Mrs. Kettering stayed with them; that the testator had in cash five thousand five hundred dollars from the sale of the farm and his stock

in Illinois; that for four or five years after he came to
Missouri, in the spring of 1881, he assumed control over
the farm, but defendant and his wife were there, living
with testator and wife; that thereafter the defendant
assumed and had absolute control of the farm and all
the property thereon, and managed the same; that de-
fendant was a strong-willed man and one who would
not permit opposition; that testator was a mild-tem-
pered old gentleman, and seemed to obviate discuss-
ions with defendant by walking away, when they had
differences of opinion; that as a rule testator and de-
fendant seemed to get along together well; that testa-
tor was fond of his daughters, the plaintiffs, and of his
grandchildren; that there had been no difference
between them; that the plaintiffs, in 1898, the
date of the will, were in very moderate cir-
cumstances financially, whilst defendant was worth
in the neighborhood of thirty thousand dol-
lars in lands and property, although he started with
but fifty dollars in 1881; that after he assumed and took
charge of the farm, all rents and products therefrom
were appropriated by defendant, as well as four hun-
dred dollars out of four hundred and nineteen dollars
which the testator got from his father's estate; that at
the time of his death the testator had no personal prop-
erty whatever, but only had the farm of two hundred
acres, which was fully paid for in the spring of 1881,
when he came to it; that the testator and wife got along
like two children and he was fond of her.

It further appears that the testator said at one
time that he had made a will leaving the property to his
wife. For the defendant it appears that there had been
a previous will, written by one Morton and witnessed
by said Morton and one Taylor, both of whom were
dead at the time the will in question was made, and
that the will in question contained the same bequests

as the will written by Morton, and as to bequests was copied therefrom.

Upon the relationship of testator and defendant, it appears that he and his wife lived with defendant's family upon the farm; that defendant for some years prior to the making of the will had the absolute management of the farm and everything thereon; that testator had no money of his own; that his clothes, such as he had, were purchased for him by defendant; that his doctor's bills were paid by defendant; that all the necessaries of life were furnished by defendant; that even his tobacco was bought for him by defendant.

Upon the question of mental incapacity, the evidence is not very strong, but shows the following facts: Mrs. Norman, the widow, who renounced the will and elected to take a child's part, says that about a year before the death of testator, she said to him, "I understood you made a will," and he said, "Mother, if I made a will, I have no recollection of it whatever." That she then said, "Grandpa, don't you recollect anything about it," and that he replied, "No, I don't," and as to a part of this same conversation, the language of the witness is thus:

"Q. Did you say anything further. A. That is all he said about it. I says to him — I says, 'What is is going to come of me if you drop off before I do?' He says, 'Well, I reckon you have got plenty here to live on.' I says, 'I know there is plenty here, but that is not the thing. I don't know whether I will get any of it or not.' He says, 'You know very well that you will get what belongs to you.'

"Q. Did he say anything further? A. He told me—he says, 'Mother,' he says, 'Marion had lots here, and he bought lots of land, and,' he said, 'I would like to have our land divided up equally among the children.' I says, 'I don't know anything about that.'

"Q. Did he object to—state what his affections

were, or his feelings were, towards his girls, up to the time of his death. A. He always liked his children. He never had nothing again his children. As long as he lived when they would come to see him, he would say, 'Girls, you must come to see me whenever you can.' That oldest girl came there and stayed three weeks during his last sickness and waited on him.

"Q. What was the youngest girl called? A. Pet.

"Q. Pet? A. She was always called that because my father called her that. She was a little bit of a fat girl, and he always called her Pet and she went by that name.

"Q. Did he say anything to you about having trouble. A. No, sir; only he said, 'Mother, there is going to be trouble.' I says, 'Why?' He says, 'Marion will want it all.'"

From this witness, it is further shown that at the time she left for Iowa, in September, 1898, the time the will is claimed to have been made, her husband was not very stout; that he could not work to do any good; that he was under treatment by a doctor for kidney trouble; that prior to leaving Illinois he had a fall which hurt his back; that as a result he could not walk for over four months; that before this accident he always went to church, but afterward he never went; that ever after this fall he complained of pains in the head, which would "go clear down;" that he always complained of his back, and always wore a plaster thereon; that whenever they played the organ at the house he would go out of doors; that he said he couldn't stand it and that it seemed like it went whirling around and around in his head and that he couldn't stand it.

And about his mental condition, about the date of the will in 1898, this also appears:

Mrs. Mowry: "Q. About 1898, what was the condition of his health, in your judgment? Did you see him about that time? A. Yes, sir.

"Q. Do you remember the time of the Omaha exposition? A. Yes, sir, I do.

"Q. About that September? A. Yes, sir.

"Q. State whether or not you accompanied your mother to Iowa at that time. A. Yes, sir. I accompanied my mother to Iowa at that time.

"Q. About what was the condition of your father, mentally and physically, at that time? A. Well, father wasn't very stout at that time.

"Q. State whether or not you had noticed any change in him up to that time, from years before? A. Yes, sir. I could notice a change in him from years before.

"Q. How was his memory? A. Well, his memory wasn't so good."

Mrs. Kettering: "Q. State if you noticed any change in your father's mental condition from the time you first knew him to his death, and if so, what the change was and what time the change come? A. Well, of course my father was quite an old man, and, as you have heard before, he had a fall, since that time, he has always been failing. Every year since, we have always noticed father failed. For a great many years, father has had a very poor mind.

"Q. What? A. A very weak mind. You would be talking on a subject, and he would start onto something else, and we would say, 'Father, we wasn't speaking of that,' and we would tell what he was talking about and start to talk about something else, and I think from that, his mind wasn't very strong.

"Q. How long has he been in that condition of mind? A. For a good many years, Mr. Kennish.

"Q. Would you state about how many years. A. I don't know that I can. Of course such things happen and we don't really keep count of it.

"Q. You may state about how many years back

his mind was in that condition you have described to the jury? A. I should think ten years, Mr. Kennish. . . .

"Q. Do you know anything about your father's condition of mind the last ten years—ten years of his life, as to being forgetful? A. Yes, sir. He was forgetful. He would be talking perhaps about one thing, and he would go off on something else. He wouldn't stay to what he was talking about.

"Q. State what was his condition in that regard, or whether he was in that condition in 1898 and 1897? A. Yes, sir, he was.

"Q. You might state what was his condition then as compared with his condition in Illinois, before he ever got hurt, as to his ability to do business and to understand it? A. Oh, father in Illinois, he could attend to business there; but, of course, for a great many years back here, he could not.

"Q. He could not? A. No, sir, not to my knowledge, I wouldn't think he could. . . .

"Q. You might state what in your judgment or your opinion, from seeing your father back as far—and talking with him—in 1898—about the time—do you remember when your mother went to Iowa in the fall? A. Yes, sir.

"Q. You went along with her? A. Yes, sir. I went with her.

"Q. About that time, could you remember what was the condition of your father's mind as to being forgetful or childish, or anything of that kind? A. Well, I would think it was that way.

"Q. Well, what would you think would be his condition at that time as to being able to dispose of his property and consider the claims of his children on him—his mental condition—as to whether he was capable or not? A. Well, I don't know about that.

"Q. How? A. I wouldn't hardly think that he was."

Dr. Davis, who had known testator for twenty years:

"Q. You might state, Doctor, what was the matter with him? A. Well, I don't know about that. It was a complication of diseases. I think the trouble came from a bad injury, though from what he said, he had what was generally supposed to be Bright's disease or kidney trouble, and a great deal of it. . . .

"Q. You say he was a very old feeble man? A. Yes, sir.

"Q. Did you form any opinion of the condition of his mind during the time you were treating him? A. No, sir, I could not say that I did.

"Q. Sir? A. I could not say that I formed any opinion. I never thought anything about it.

"Q. At that time—did you, at any time, form an opinion as to the condition of the old man's mind, as to whether or not he was— A. Well, he was in a feeble condition, physically, and mentally both, when he died, and he had been for a good while.

"Q. Were you treating him in 1898? A. I do think I did. I don't think there was hardly six months went by that I didn't see the old gentleman.

"Q. Well, what was his condition about that time —1898—mentally and physically? A. That would take it back how many years?

"Q. Six years ago. A. He was a very feeble man.

"Q. Feeble minded, did you say, or what did you say?

"By Judge Ramsay, counsel for defendant: Not quite so direct.

"A. Well, I wouldn't like to term him that way. Physically, though, he was a weak man and childish, you might term it. I would term it childish. He was

an awful good old man. He had an awful good disposition.

"Q. I wasn't talking about his goodness. State what was your opinion of his ability at that time to realize the nature and extent of his property? Did he do any business? A. The old man never done any business with me. . . .

"Q. What was his condition about transacting business in 1898? A. I don't know, Judge. I know he didn't transact any business with me. That is far as I could tell.

"Q. From your judgment of him as a physician, what would be your judgment as to his ability to transact business in his condition then? A. Well, I wouldn't think his ability was very good, and from the fact that he never did transact any business that I ever seen, either with me or with any body else. Mr. Marion Norman seemed to . . . .

"Q. And you say you don't know and have no judgment as to his condition of realizing what he had and making a disposition of it—ability to intelligently know what he was doing with it? A. I wouldn't like to say about that, Judge, but he was, physically, and it looked to me like he was a generally broken down old man. That is about as near as I can give it. I do know that he didn't transact any business—not with me."

James South, who worked on the farm for three years and was there at the time the will was prepared:

"Q. Now, you say you were down there on the place in 1898. You might state what was the condition of old Mr. Norman at that time. A. Well, it would be pretty hard to do.

"Q. It would? A. Yes.

"Q. Can you give an opinion? Do you know how his mind was, as to being able to attend to business?

A. Sometimes he would be pretty lively, and other times he wouldn't.

"Q. How was his mind as to being able to attend to his affairs, or to realize his business or his property? A. Well, I don't know about that. . . .

"Q. Around on the farm, you were talking about what you were doing? A. Yes, sir, and such things as that.

"Q. Discussed with him how you should fix the fence that you were fixing and how to trim the trees when you were trimming trees? A. Yes, sir. Sometimes he would ask me what I thought was the best way and sometimes I would ask him. That is the way we would have it; we worked along and everything went along as nice as you please.

"Q. He talked intelligently about these things, didn't he, Mr. South? A. Not very much.

"Q. Intelligently? Did he talk intelligently? A. Well, sometimes he would, and sometimes he wouldn't.

"Q. When wouldn't he talk intelligently? A. Well, I couldn't tell you when, but I would notice sometimes he would talk different from other times."

Mrs. Ham, a near neighbor for years:

"Q. Did he say anything about his head being woolly or anything of that kind? A. He had that expression, and he had another expression that I can't call just now to my mind, but he complained lots about his head. Oh, Grandpa had been complaining, I know, for fifteen years or more.

"Q. Well, what was his condition, now, for six or eight years, Mrs. Ham? A. Well, in my opinion, I should say—I hated to say it. I really hated to say it. I never said it to anybody, but I thought he was getting childish—what you call getting childish."

Frank Kettering, who worked there in 1895 and 1896 or 1896 and 1897, says that his grandfather always knew him as Frank and called him Frank up until about

the last year he worked there, and that he then called him Charlie, although he was never so called by anyone else. In this he is corroborated by Mrs. Kettering, the mother.

The above evidence was shaken to a more or less extent upon cross-examination. Such was the case of the plaintiffs. Defendant's testimony, such as may be required, will be noticed in the course of the opinion.

The first material question in this case is the determination of where lies the burden of proof upon the question of undue influence. Ordinarily where no fiduciary or other similar confidential relation is shown, the burden of establishing undue influence lies with the contestants or plaintiffs in suits to set aside wills and so continues throughout the trial. Not so, as to mental capacity. Upon the question of mental capacity, the burden is upon the defendants or proponents of the will, throughout and never changes or shifts. They have the burden throughout both as to mental capacity and legal execution of the will. We have recently reviewed our late cases, in the case of Goodfellow v. Shannon, 197 Mo. l. c. 278.

So that under ordinary circumstances the burden is upon plaintiffs, throughout, to show undue influence, and upon defendants to show mental capacity and the legal execution of the will. However, if plaintiffs show a state of facts which establish a fiduciary relation, or some such similar confidential relation, between the defendant, a principal beneficiary, and the testator, then upon that showing the burden shifts. Not only this, but by proof of such a relation and such a bequest, the law indulges the presumption that undue influence has been used. [Campbell v. Carlisle, 162 Mo. l. c. 644; Hegney v. Head, 126 Mo. l. c. 627-628; Roberts v. Bartlett, 190 Mo. l. c. 702; Bradford v. Blossom, 190 Mo. l. c. 143; Dausman v. Rankin, 189 Mo. l. c. 708; Maddox v. Maddox, 114 Mo. l. c. 40.]

In the Campbell case, supra, we said: "Ordinarily, in cases of this character, the burden is upon the proponents of the will to prove its proper execution and attestation, and that the testator was twenty-one years of age or over, and of sound mind, and when these facts are shown the proponents make out a prima-facie case, and it then devolves upon those attacking the validity of the will to prove fraud or undue influence, if either is charged. [Norton v. Paxton, 110 Mo. 456; Gay v. Gillilan, 92 Mo. 250; Maddox v. Maddox, 114 Mo. 35; Carl v. Gabel, 120 Mo. 283; Berberet v. Berberet, 131 Mo. 410.] But in cases where a 'patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close, confidential relations exist, the law indulges the presumption that undue influence has been used, and such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof should be required besides the *factum* of the will before the will can be sustained.' [Marx v. McGlynn, 88 N. Y. 357; Hegney v. Head, 126 Mo. 619.]"

And in Maddox v. Maddox, 114 Mo. l. c. 46, the doctrine is put thus: "It is also a universally recognized rule of equity, which is applied also in analogous cases at law, that when a confidential relation is shown to exist between the testator and the recipient of his bounty, an exerted influence will be presumed to have induced the bequest, and the *onus* is cast upon the beneficiaries to make explanation of the transaction and establish its reasonableness. [Gay v. Gillilan, supra; 2 Pomeroy's Equity Jurisprudence, sec. 951.]"

The legal principle is well established, but are the facts in this case sufficient to show such a fiduciary or confidential relation, so as to raise the presumption of undue influence? We think so. If there was not abso-

lute mental incapacity, there was great weakness of mind showing a condition which would at least be an inviting field for undue influence. Here was an old man with sixteen thousand dollars worth of property and not in actual possession or use of a penny. He lived with his son, who as agent or otherwise managed all of his property interests; gave him what food and clothes he had to have, and purchased for him the tobacco he used. He furnished and paid for his doctor. For years, as shown by the plaintiffs, the defendant looked after all matters for his father, and in effect treated him as a child, save and except there is no evidence of his having given the father any little spending money, as the indulgent parent does with the child. We think the evidence introduced by the plaintiffs was such as raised the presumption of undue influence. This, it is true, is rebutted by the testimony of defendant, to the effect that his father had told him that he would will him the farm if he would care for him and his mother. But this does not change the fact that upon the plaintiffs' showing there was the presumption of undue influence. This presumption must be rebutted by testimony, and the credibility of that rebutting testimony is for the jury and not for the court. [Gannon v. Laclede Gas Light Co., 145 Mo. 502.]

When the plaintiffs made out their prima-facie case upon the question of undue influence by showing a state of facts from which there arose a presumption of undue influence, then the defendant was required to rebut the presumption, as the defendant in the Gannon case was required to rebut the presumption of negligence. In the Gannon case, the defendant by a mass of testimony rebutted the presumption, and as against this evidence the plaintiff offered nothing, yet by a majority opinion this court held that a peremptory instruction should not be given in such case, and the doctrine there applies with force and effect to the case at

bar. The rule announced is that the credibility of that testimony was within the peculiar province of the jury, for its judgment thereon, although undisputed. This case has been followed many times since.

But the case at bar is much stronger. The plaintiffs do not rest solely upon the presumption, but there are at least some facts tending to show undue influence in addition. We have the peculiar circumstances of the will being executed while the testator's old wife was absent upon a visit; a previous will of like tenor had been made, so defendant says, yet although he knew of it, not a word was breathed to his mother. The last witness to this previous will had but recently died; the inequality of the will itself; the peculiar expression in the first part thereof, to the effect, "I, Wesley Norman, . . . being of sound mind *and free from all undue influences*," etc.,—all these things point to a master mind, not the enfeebled mind of the decrepit testator. What testator before was ever so cautious as to proclaim to the world that he was "free from all undue influences?" To our mind, if there were not other earmarks, we have in this expression enough to cast suspicion upon this instrument, and to cast suspicion upon some of the testimony for defendant. It is true that at the time of the execution of the will, in the absence of the old and loving wife, the defendant was conspicuous for his absence. This conspicuous absence, taken with the language above quoted, may indicate something. Discussing this in the case of Bradford v. Blossom, supra, BURGESS, J., said: "When Mrs. Bradford went to execute the will he took her to Mr. Thompson's office, introduced her to him, then withdrew until the will was executed by her, when he returned, and he and Mrs. Bradford left together. It seems somewhat strange that after Mr. Blossom took Mrs. Bradford to Mr. Thompson's office to execute the will, he should have retired therefrom while she was executing it, and,

after she had done so, return for her, unless it was to avoid any suspicion that might be occasioned by his presence when she signed the will, that she was executing the same by reason of his undue influence over her.''

In addition, the testimony of the scrivener stands disputed as to the circumstance of being called to write the will. After the death of the testator, he mentions the fact of there being a will to no one. except defendant, although the others were present at the funeral. Defendant says that he went with the scrivener to have the will probated; that he had no knowledge of this last will until told about it, yet when it was presented to the court he did not even read it or inquire as to its contents. All this is a little singular to our mind. How the credibility of such evidence would strike the intelligence of a jury we do not know.

Upon the question of mental incapacity the evidence is meager and not strong, but in our judgment there is evidence sufficient upon which to take the judgment of the jury as to the question of undue influence. Undue influence need not be proven by direct and positive testimony, but it is sufficient if it is.shown by, or can be inferred from, the facts and circumstances in evidence. [Roberts v. Bartlett, 190 Mo. 1. c. 700-1; Bradford v. Blossom, 190 Mo. 1. c. 139; Rood on Wills, sec. 190.]

Nor is it required that the overt acts of undue influence were exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testator had been acquired previously and did operate at the time of making the will in the disposition of the testator's property. [Taylor v. Wilburn, 20 Mo. 310; 1 Underhill on Wills, pp. 187-8.] Whilst the case is not as strong for plaintiffs as might be wished by them, yet in our judgment there

was error in refusing to submit the case to the jury upon the question of undue influence. The judgment will be reversed and cause remanded.

All concur, except *Woodson, J.,* not sitting.