WALTER HERSHEY and MAY YANCEY v. OLIVE HERSHEY HORTON, Appellant, and MOLLIE WHEELER and JAMES M. HERSHEY.—15 S. W. (2d) 801.

Division One, March 29, 1929.

*Collet & Son* for appellants.

*John D. Taylor* for respondents.

ELLISON, C.—This is a suit in equity to cancel two certain deeds conveying 160 acres of land in Chariton County, for mental incapacity of the grantor and undue influence practiced upon her by the grantee. The grantor was Amanda Hershey, deceased; 'the grantee is her daughter Olive Hershey Horton, the appellant. The petition also prayed cancellation of a third deed by which the appellant subsequently transferred about thirty-two acres of the land to her brother, the defendant James M. Hershey—with notice of the foregoing, it is alleged—and for partition. The circuit court found for the plaintiffs on all the issues tendered as aforesaid, cancelled the deeds, and ordered partition by a sale of the real estate and a division of the proceeds.

The deceased left five children, a son, Walter Hershey, and a daughter, May Yancey, who were the plaintiffs and are respondents here; the daughter Olive Hershey Horton, who is the appealing defendant; and a daughter Mollie Wheeler and the son James M. Hershey, who were impleaded as defendants, but defaulted.

The land in dispute all belonged originally to Ezra Hershey, the father. He died testate in 1906, leaving 240 acres of land and about $2100 in personalty to his widow, the said Amanda Hershey, who was then seventy-two years old. For some five years thereafter she continued to live on the family homestead on the land, but it finally became necessary to have some one look after her. All of the children were married and had families of their own except the appellant, who was separated from her husband and lived in Kansas City, where she was working as a professional housekeeper. A family arrangement was made by which the appellant moved to the mother's home to take care of her.

The contract was that the appellant should care for the mother for the rest of the latter's life, and as compensation for her services receive eighty acres of the 240 acres, which was worth about $35 per acre according to the evidence. It appears from the record that the plan was thoroughly discussed by the parties before it was entered

into. The appellant wanted the eighty acres deeded to her at the time; the mother objected to parting with the title during her life. Finally she made a deed, but a provision was incorporated in it that the appellant should not sell the land before the mother's death. This transaction occurred in 1911, and is not one of those attacked in the suit.

Things ran along smoothly until about five years later in 1915 or 1916, when the mother suffered a stroke of paralysis, which very materially impaired her health and in course of time rendered her practically helpless. During the last three or four years of her life she was bedridden, and much of the time had to be cared for like an infant. She could not raise her hands, or feed herself. She spoke with difficulty and it was hard to understand her. She died on May 29, 1921, when eighty-seven or eighty-eight years old. The two deeds which are assailed in this proceeding were executed by her on June 17, 1919, and November 17, 1920, respectively, the former a little less than two years before her death, and the latter a little more than six months. The expressed consideration in the first deed was love and affection; in the second, love and affection and one dollar; in the deed from the appellant to Judge Hershey, one dollar.

For some eleven years after Mrs. Hershey acquired title to her deceased husband's property in 1906 through his will, her business affairs were looked after by her son, the defendant Judge James M. Hershey. He assisted in administering on the father's estate, and out of the $2100 in personalty paid two legacies of $300 or $400 each to two of the girls who had not received their allotment of a distribution made before the father's death. He also paid the burial expenses and for a monument. This left about $1100 in the bank to the mother's credit when Judge Hershey turned over the handling of her business matters to the appellant, as will be later explained.

During this eleven-year period the farm yielded sufficient income to maintain itself and support the mother. Judge Hershey looked after renting the parts that were rented, made the leases and collected the rent, kept up the fences, got in the firewood, etc. But he would consult the mother in regard to the selection of tenants and on other matters, and would abide by her wishes. The bank account was carried in her name; she kept the pass book in her possession, and when he put money in the bank he would return the book to her custody.

In 1917, not long after the mother suffered the paralytic stroke, the appellant took over the management of her mother's affairs. It appears that the defendant Mollie Wheeler also had a hand in it. Judge Hershey was asked on the witness stand "who wanted it that way?" and he answered, "Mrs. Horton" (the appellant), "and finally my mother agreed to it, she wanted it that way, and whatever

she wanted went, as far as I was concerned." At that time, he said, the mother had reached a stage where she would communicate her wants to him through the appellant. The appellant was the first one who spoke to him about making the change, and the matter was discussed on a certain occasion at the mother's home, when he, Mrs. Wheeler, the appellant, and the mother all were present. They gave him no particular reason, but one reason really was that he had objected to the appellant's spending too much money, particularly in paying $100 in settlement of what he thought was an unfounded claim against the estate of their deceased brother out West. After the appellant assumed charge, for almost the last two years of the mother's life Judge Hershey did not go out to the mother's home. "My room was more desired than my company" by the appellant particularly, he testified.

Now, about the two deeds. The testimony for appellant was that in 1919, some eight years after the contract and deed to the eighty acres had been made in 1911, the mother began to reflect on the fact that the farm dwelling house was not located on the eighty acres. It was on another forty acres. The mother did not want the appellant "to be kicked out of a home when she passed on"—the appellant stated in a letter to her brother, the plaintiff Walter Hershey, which the latter introduced in evidence—so she became desirous of conveying the forty acres to the appellant.

The appellant's sister Mollie Wheeler also testified on this point. She said the matter was talked over several times in her presence by the appellant and the mother. Finally the appellant wrote Mrs. Wheeler, who lived in Keytesville, and asked her to see Judge Drace and the county surveyor, Mr. Arrington, about making the deed. Both went out to the Hershey farm. Mr. Arrington furnished the description, which ran by metes and bounds, and Judge Drace prepared the deed—before conferring with Mrs. Hershey. The defendant Mollie Wheeler and a Mr. Latham also were present. Mrs. Hershey signed by mark and Messrs. Arrington and Latham signed as witnesses. The acknowledgment was taken by Judge Drace as notary public, and the instrument was filed for record the next day.

About eighteen months later the second deed was executed. It conveyed to the appellant the mother's entire 160 acres remaining after the aforesaid eighty acres of the original 240 acres had been deeded to the appellant pursuant to contract in 1911. This included the forty acres covered by the deed made in June, 1919; that tract was in both deeds.

In the appellant's letter heretofore mentioned, she accounted for the execution of this second deed by saying "the last three years have been just awful and I suppose she" (the mother) "realized that it has taken much more than talk from others that have done nothing for

her—to take good care of her—so last year she gave me a deed to the remainder—so I have the deeds to all the 240 acres and they are recorded.''

Judge Drace acted as scrivener and notary public at the execution of this second deed also. The defendant Mollie Wheeler engaged his services and she and her daughter Carrie drove him from Keytesville out to the farm. Either Mrs. Wheeler or the appellant—he said he could not remember which—gave him the information necessary to the drafting of the instrument; he had no conference with Mrs. Hershey, the grantor, beforehand. She signed by mark, and Judge Drace and Mrs. Wheeler signed as witnesses. The deed was filed for record on November 22, 1920, five days after its execution.

Of the parties present when the two deeds were executed, Judge Drace, Mrs. Wheeler and her daughter Carrie testified. The appellant, being incompetent under the statute (Sec. 5410, R. S. 1919), took the stand only to deny certain statements or admissions attributed to her by other witnesses. Messrs. Arrington and Latham were not produced by either party. Judge Drace said he had had no previous acquaintance with Mrs. Hershey; and that he merely explained to her ''what the deeds were and asked her if they were made of her own free will and accord,'' and she answered ''yes.'' Being asked what her apparent mental condition was at the time and whether or not she appreciated what she was doing, he said, ''Well, it was just an ordinary person of her age, I presume, she was very feeble physically, and couldn't hardly talk, but I guess that's a natural condition for a person of her age.'' The court struck out the latter part of the answer as a conclusion, and the witness then said: ''I would say just ordinary for a person of her age and physical condition.'' A few questions later he added that on one of the two occasions Mrs. Hershey asked him if he was sure the deed was made right—that was the only comment she made.

This witness, Judge Drace, was called as a witness for appellant. Under cross-examination by respondents' counsel he was asked: ''Will you say now that Mrs. Hershey knew what was in those deeds —that you knew that she knew and understood?'' and he answered, ''Why no, Senator, I have no way of knowing she knew.'' He went on to say, in answer to questions, that she was in a very feeble condition and unable to sign her name except by mark, and that he doubted, but didn't know, whether she would have been able to give him the information required for preparation of the deeds, but that there was not much difference in her physical condition on the two occasions. His cross-examination was concluded with these two questions and answers:

''Q. In your opinion, could she have told what land she was conveying by you reading the description to her? Could she have identi-

fied the land being conveyed? A. I don't know; very often people of that age understand things and you have no way of knowing whether they do or not.

"Q. I am not talking about a woman of eighty-odd years, but about a woman who has been in bed for three or four years, and a woman who has been suffering from cerebral paralysis, an ailment which affects people's mind—could she have had any conception, from the legal description, what lands she was conveying, or what part of the land she was conveying? A. I don't know."

On redirect examination appellant's counsel asked the witness these questions and the witness made these answers, which are stressed in appellant's brief:

"Q. You had not sufficient acquaintance with her to pass upon her mentality? A. Never knew her before.

"Q. When you said to Senator Taylor that you didn't think she could have given you the information from which to draw this deed, did you have reference to her mental or physical condition, or ability to talk? A. She couldn't talk so I could see what condition her mind was in.

"Q. Unacquainted with her as you were, you could not understand her talk to any appreciable extent? A. No, sir."

Dr. A. W. Zillman, a physician who had practiced in Chariton County thirty-five years, was a witness for respondents. He said he was called professionally to treat Mrs. Hershey in 1915 or 1916. She had had a stroke of paralysis. He made five or six visits between then and June, 1919, when the first deed in question was made, the last visit being a month or two before that event. The second trip was a week or two after the first and the others were interspersed along two or three months apart. He went only when called by the appellant, as he had explained to her "there wasn't much to do in these kind of cases." The witness testified from memory. He had not consulted his record showing the dates of the visits. By the appellant's testimony, however, it was shown Dr. Zillman was the family doctor and waited on Mrs. Hershey occasionally until he became ill. Then Dr. Hughes was called, but appellant's counsel brought out that he was sick at the time of the trial and could not testify. In the testimony of Dr. Zillman 'the following appears:

"Q. What were you treating her for, Doctor? A. Well, she had had a stroke of paralysis, she had had a cerebral hemorrhage when I first saw her.

"Q. What effect does a cerebral hemorrhage have upon a person's mental faculties? A. It has a—it does not leave a very good effect, it runs a good deal upon the severity of the cerebral hemorrhage and the age of the patient. . . .

"Q. I'll ask you to say, based upon your examination and your occasion for ascertaining her condition, and your knowledge of the effect of the disease upon her, whether her mental faculties were affected? A. I think so, yes, sir.

"Q. I'll ask you to say, if, in your opinion, she was competent to transact business? A. Not when I saw her, no, sir.

"Q. That extended over the period I have mentioned? A. Yes, sir."

On re-cross-examination, he said:

"Q. Dr. Zillman, I think you say she always knew you and you say she carried on a conversation with you when you were there? A. Yes, sir.

"Q. She always appeared to know everybody else that came around? A. I don't know about that.

"Q. Well, as far as you saw her? A. Yes, sir.

"Q. You never saw her when she was not in a condition to realize who her people were? A. No.

"Q. You never saw her when she was not in condition to realize what property she had? A. I don't know about that.

"Q. You didn't discuss that with her, but you know whether she had judgment to know whether she owned this farm or how much of it there was? A. I think she could.

"Q. You never saw her when she didn't have that much mental capacity? A. I think not.

"Q. Not in her most suffering but what she could realize that? A. I think so."

The respondent Walter Hershey lived in Kansas and saw his mother only once or twice after she suffered the paralytic stroke. Appellant's counsel also elicited the fact that he had not been present either at the funeral of his father or his mother, but that he came back to Missouri later to see about his interest in the estate. He was not asked and did not attempt to express an opinion as to the mother's mental condition when the two disputed deeds were made. He did testify, though, that he was not advised in advance of the execution of either. The appellant told him about the first deed, the one to the forty acres, and wrote him about the second after the mother's death. It was this letter which brought him back to Missouri after the funeral. The letter has been referred to heretofore. It was written by the appellant voluntarily, this plaintiff testified; he had not threatened her with litigation. It is too long to set out in full. After giving her version of why the two deeds were executed, as we have heretofore stated, the letter goes on:

"So after she died Jim" (the defendant Judge James Hershey) "started to begin a suit at law before I knew that he meant to or was mad about it—of course I could tell you all this much better than

writing it—so the probate judge informed me of the facts and I said to him that I had written to you telling you just what Ma had given me and that I was willing to do what was reasonable to please you all—so I asked Jim to come over and then I wrote to you again telling you just what he said—that he would begin litigation at once charging Ma with being insane, and he had told the probate judge and the lawyers the same thing, unless, I, right away turned over to him forty acres for his part and forty acres for your part saying he would look after your part—making eighty acres or one-half of the 160 acres—denying that I was entitled to any but the first eighty acres, but the judge layed some facts before Jim, and when he was convinsed that he could not keep me from 1 fifth of the 160 acres and that he could not get but one-fifth for himself even if he went to law and that he had no right to look after your part as you could look after your own, after all this and a good deal more he desided to take the thirty-two acres laying next to him on the West you know where it is—so I gave him a deed to that last Saturday—so as May'' (the plaintiff, Mrs. Yancey) ''and Mollie'' (the defendant, Mrs. Wheeler) ''say they are willing for me to have their part because they know what I have done, it is up to you whether you will let things stay as they are or not—do just as you want to—I wish you would come right away, as I don't know if I have made it plain or not—you can let things stay as they are giveing me your part—or you can have thirty-two acres deeded to you or you can have all the deeds set aside except my first eighty acres.''

Regarding the statement in the letter that the defendant Judge James Hershey claimed the mother was mentally incompetent and disputed the two deeds for that reason, Judge Drace, the scrivener, testified it was his impression that before he assisted Mrs. Hershey, the mother, in executing the deeds, Judge Hershey came to him and asked him not to make a deed for the mother because he didn't think she was competent. But Judge Hershey testified he did not recall ever having threatened the appellant with litigation over the deeds because of the mother's incompetence, and he said the argument he used to Mrs. Horton in inducing her to deed back thirty-two acres of the land to him, was that he also had contributed a good deal to the mother's care and was entitled to his share for that reason.

The respondent May Yancey testified that sometime about the year 1918 the appellant asked her to use her influence to get Mrs. Hershey the mother to deed the home forty acres to her (the appellant). This witness said she declined, but sometime later learned the deed had been made. She didn't learn of the second deed until just before the mother died, which was over six months after its execution. She said she went to see her mother every few days and that the facts were concealed from her. The mother never discussed business with her

and told her on several occasions "they advised her to keep her business to herself." When the appellant told Mrs. Yancey about the second deed, she said she and, the mother had run out of money and that she was advised to get the deed and borrow money on the land A short time after the mother's death the appellant declared she had been compelled to draw on her own funds. When asked about the mother's mental condition in 1919 and 1920 Mrs. Yancey said: "Well, I don't mean to say that my mother was insane, or anything of the kind, she was very feeble, of course she was broken down physically and mentally." On cross-examination the witness admitted her mother was always glad to see her, and knew her, and as far as she (the witness) knew always recognized other people who visited her. In her last years she was not physically able to talk much on account of her paralysis. The last year of her life it was hard to understand very much that she said.

The defendant Judge James Hershey was called as a witness by the plaintiff-respondents. In regard to the mother's mental capacity he said she was very childish like most old people, in her dotage, and notionate, changeable, but at times she appeared to know what she wanted when he saw her last. That was two years before her death, as has heretofore been stated, but from what he learned from the appellant and Mrs. Wheeler, although her physical decline continued thereafter, nevertheless she still could give orders about what she wanted done. By nature she was a woman of pretty good will, of tolerably strong convictions and thrifty with her means. She was of average mental strength for a woman of her years. "Q. So that her mind was rather active, looking out for what was going on, up to the very last, as you understood it? A. That was my understanding of the case."

Charles Yancey was the husband of the respondent May Yancey. He said he was at Mrs. Hershey's home frequently during the last two or three years of her life. Asked about her mental condition he answered, "Well, I don't know; it didn't look very good to me;" and again, "Well, I don't think she could do any business to amount to anything." Finally he was asked if the mother possessed sufficient mental capacity in 1919 and 1920 to understand the contents of a deed conveying land, and he answered, "I don't think so, I don't know."

On cross-examination, when interrogated about Mrs. Hershey's knowledge of her property and farm, he said he thought she didn't pay much attention to the farm, and that "she knew she was there and that's about all." But he admitted she knew him every time he went there and that she always recognized her kinsfolk. She was a woman of pretty strong mind for her age when she was going about, and the difference in her condition at the last was due to lying in

bed three years because of her paralysis. This, the witness opined, impaired her mental faculties. The cross-examination was concluded with these questions:

"Q. You think she didn't realize what land she had? A. I don't think she knew anything about it; if they put anything before her she would sanction anything about it.

"Q. Then you didn't mean what you said a while ago that she was a woman of ordinary mental capacity for a woman of her age? A. When she was up and around, yes."

The defendant Mrs. Wheeler was a witness for the appellant. She testified that some years before the mother had the paralytic stroke she declared if she lived as long as ten years it would be worth all she had to take care of her. This was in the presence of Judge James Hershey and Mrs. Yancey, and they both agreed to it. (Judge Hershey denied any recollection of this, and it appears Mrs. Yancey was not asked about it.) In this connection it is to be remembered the mother did live just ten years from the making of the contract in 1911. After she was stricken the mother said she intended to give the appellant all she had, because she realized she had got more helpless than when the contract was made and had become a burden, and yet the appellant had stayed with her and cared for her.

Mrs. Wheeler expressed the opinion that her mother's mental condition was pretty good for a woman of her age when the disputed deeds were made. She discussed her business affairs to a certain extent, but couldn't talk a great deal, and for quite a while kept track of and directed her business. Even at the time of the execution of the deeds and afterwards she was told of everything and knew everything that was told her. Partly, she would give directions. She knew what she was doing and wanted done, and could understand the effect of the two conveyances. The appellant told the witness toward the last that she was having to use her own money for expenses and also told the mother, and the witness thought she remembered hearing the mother speak of it. Mrs. Wheeler said she was out at the Hershey home probably a dozen times a year and sometimes would stay a week or two. She denied urging the mother to make the deeds and said she had no interest in them.

Mrs. John Wren lived in Kansas City, but prior to 1921 was a neighbor of the Hershey family in Chariton County. She visited there frequently and was on friendly terms with them. She testified Mrs. Hershey told her on one occasion "Ollie,"—that is Mrs. Horton, the appellant—had been awful good to her and she meant to give Ollie everything she had. One morning when Mrs. Horton was absent Mrs. Hershey said she had been quite a care, and that it was worth everything she had—that Ollie had cared for her well. Mrs. Wren further said Mrs. Hershey always knew her and would in-

quire about her family, and always seemed to realize her surroundings, what property she had and who her kinsfolk were.

James Wren said he had been in the Hershey home once or twice a week during the latter part of Mrs. Hershey's life; that he had rented some pasture from Mrs. Horton and had cattle there, and would go to the house to call. Mrs. Hershey would always visit with them. The last time was in April, 1921, about a month before she died, when she invited him to her birthday dinner. On these occasions she talked on various matters of personal, local and general interest, and, speaking of her mental condition, the witness averred "I think it was as good as mine is now." He continued that he thought she realized what property she had and who her people were, and said he didn't think she was influenced by anyone, though he didn't know that. She spoke gratefully of the service Mrs. Horton was rendering her.

Scott Hershey was a double cousin of the five Hershey children. He had moved from the neighborhood in 1911, but returned more or less frequently to visit, always calling on his aunt, Mrs. Hershey. The last time was in 1919. She was more cheerful than he had seen her for a long time. The witness gave this account of their conversation, Mrs. Hershey speaking first: "Ollie is so good to me, I am feeling so fine about it I hardly know how to express my opinion about it; and I said, Aunt 'Manda, I am mighty glad to hear that, its mighty nice, and she just said, I am going to give Ollie everything I have got." This conversation occurred out on the porch, he said. On cross-examination he said it was in October, 1919, and that Mrs. Hershey walked out on the porch unassisted except by her own use of a cane. Being pressed on this part of his story, he said "My memory isn't like it used to be, I am getting old; I wouldn't aim to tell a story for anything in the world," and counsel for respondents assured him, "We don't question that, Mr. Hershey."

Miss Carrie Wheeler, daughter of the defendant Mrs. Mollie Wheeler, said that her parents had a farm near the Hershey farm and in 1917 they bought an automobile. From then on they would go out to their own land and call on Mrs. Hershey three or four times a week. They lived in Keytesville. Her old grandmother always spoke to her when she came and left, but the last three years of her life "she was just like a child, she would want things; I remember one Christmas she wanted an apple, that was in December before her death." The grandmother would talk about various things, a new baby in the family, the automobile, and wishing they could take her to see her only living sister. She was always interested in children.

Toward the last Mrs. Hershey's physical infirmities were such that you had to lean way over to understand what she said, but her mental condition was wonderful; for what she had suffered she remembered

well. On one occasion she told the witness she had come to the farm as a bride and set out trees and shrubbery, and she said to the appellant, ''You are the only one that would never sell the home place and injure these beautiful trees.'' Before the second deed was made Mrs. Hershey said, ''I am going to take care of Ollie; she's taken care of me.'' When the conveyance was executed she realized and comprehended what she was doing, what property she had and who her people were. She loved Mrs. Horton, the appellant, and would reach up and pat her face and want her to kiss her, but she did not always obey Mrs. Horton's requests. Once when Mrs. Horton wanted to change the bed Mrs. Hershey objected and ''there was a terrible fuss over that, just like an old person would.''

Mrs. Horton, the appellant, denied having requested Mrs. Yancey, one of the respondents, to influence the mother to deed her the forty acres—as it will be remembered Mrs. Yancey testified—but admitted she had talked to Mrs. Yancey and told her what the mother had said she was going to do. Mrs. Horton further testified that during the ten years she took care of her mother there was no decline in the latter's mental faculties. She said, ''Well, I honestly believe that her mind was just as good as ever;'' and that there never was a time when the mother seemed not to appreciate her surroundings fully, except when she would occasionally have a little fever and be delirious, as the doctor said.

I. The appellant has cited some twenty-four decisions of this court bearing on questions of mental competency and undue influence as applied to the execution of wills and deeds. We have read all of them and others—but cannot extend the opinion by commenting on the peculiar facts and reasoning of each. The propositions first laid down by appellant are: (1) the law presumes the grantor was sane and had mental capacity to make the deeds, and the burden of proving the contrary rests upon the respondents; (2) the deeds being voluntary and based on the consideration of love and affection of parent for child, the standard of mental capacity exacted by the law is no different from that required in the execution of a will. Both these propositions seem to be sustained by the cases. [Masterson v. Shehan (Mo. Court en Banc), 186 S. W. 524, 526; McFarland v. Brown (Mo. Div. 2), 193 S. W. 800, 804. In the McFarland case it is said:

''Under ordinary conditions of barter and sale it requires a higher degree of mental strength to make a valid deed than to make a valid will. But where a deed is executed by a parent conveying land to a child in consideration of love and affection, that distinction is not made. In all cases where the mental capacity to execute deeds of the latter kind is called in question, the courts determine the question

by applying the same test as they apply in cases involving wills. [Jones v. Thomas, 218 Mo. 1. c. 538, 539, 117 S. W. 1177, and cases there cited; Nicholson v. Duff, 189 Mo. App. 1. c. 57, 174 S. W. 451.]

"A party suing to set aside a deed because of mental unsoundness in the grantor has the burden of proving the want of capacity. [Chadwell v. Reed, 198 Mo. 1. c. 379, 95 S. W. 227.]"

There is, however, a curious and striking inconsistency in these holdings. In the matter of the grantor's mental competency deeds are put on a par with wills when the former are executed for what may be called a testamentary purpose, or something akin to it. But when it comes to *sustaining* the respective instruments in court, although the statute requires a will to be executed with certain formalities, to be attested by at least two witnesses, and to pass the scrutiny of a probate court, yet after all that, in a will contest proceeding the issue must be tried to a *jury* (and this court has said juries are prone to break wills, Huffnagle v. Pauley, Mo. Div. 2, 219 S. W. 373, 378) and the burden is on the *proponents* throughout the trial to establish the mental capacity of the testator. [Mowry v. Norman, 204 Mo. 173, 189, 103 S. W. 15, 18.] On the other hand, if the same donor, instead of making a will, executed a deed in effectuation of the same purpose, without preliminary formalities, without attesting witnesses and without probate proceedings, the law says the instrument imports verity and the burden is on the *contestants* to overthrow it in a trial before a *chancellor*.

The second proposition urged by appellants is that there is no direct evidence of undue influence in this case, and no sufficient proof of a confidential relation between the grantor and grantee to raise a presumption of undue influence. The appellant concedes the general doctrine that when a confidential relation is shown, a presumtion of undue influence arises and the burden shifts to the grantee to overcome it (Cornet v. Cornet, 248 Mo. 184, 234, 154 S. W. 121, 137), but she says the rule has no application to a voluntary conveyance from parent to child, induced by parental gratitude for services rendered, though the relation between the parties may have been intimate and long sustained.

It is difficult if not impossible to deduce any hard-and-fast rule from the decided cases. The facts vary greatly. In many of the decisions the holding that there was no such confidential relation appears to be bottomed on the conclusion that the relations were merely affectionate and the services incidental. In McF'arland v. Brown, supra, 193 S. W. 1. c. 806, Division 2 of this court said:

"The relation of confidence which ordinarily exists between mother and son without more would not be sufficient to raise the presumption of undue influence. There must be in addition substantial evidence showing especial trust in the management by the son of the mother's

business matters, or unusual influence and control arising from the son's personal care and charge of the mother. [Citing cases.]

"The fact that Mrs. Brown depended upon Kiah for advice more than upon others, that 'he was her pet,' would not establish the relation and raise the presumption. He was her only living child. [Citing cases.] The evidence shows that other persons attended to many more of her business transactions, such as selling her stock and produce, collecting her money, buying her necessaries, than did her son. He had no general charge of her business, and she committed to him no special authority which was not committed to others. The most that could be said was that she may have relied upon him for advice about the management of crops somewhat more than upon others. He had no personal care of her until a few weeks before her death, which was several months after the deed was made."

In Elzea v. Dunn (Mo. Div. 1), 249 S. W. 933, 936, this division said:

"We are satisfied from the evidence that he did not regard her as a business advisor, or rely upon her in any way to manage his property and business affairs. . . . The relation of a mere housekeeper, doing no more business for the householder than Mrs. Dunn did for Mr. Elzea, in view of the circumstance that he stood virtually *in loco parentis* to her as his only child, is not sufficient to create a fiduciary relation between the housekeeper and the householder." [Citing cases.]

In Jones v. Thomas, 218 Mo. 508, 536, 117 S. W. 1177, 1186, the following was stated as the applicable rule:

"The only testimony relied upon which tends to establish that relation is that which shows the age and condition of the grantor, the unequal division of his property among his children, and the fact that he resided with his son Thomas from and after the death of his wife in the year 1899 down to the time of his own death. That alone is not sufficient. The evidence should have gone further and should have shown that Thomas had charge and control of his father and that he cared for and administered unto his health, comfort, wants and necessities, or that he had charge of and conducted his father's business, or that some such relation existed between them, showing that the father actually reposed trust and confidence in his son. The bestowment of such love and kindness upon the father that a son owes to his parents is not sufficient evidence from which the court can draw the conclusion that such a confidential relation exists between them that the law will presume a conveyance made by the latter to the former was the result of fraud or undue influence."

In Bonsal v. Randall, 192 Mo. 525, 531, 91 S. W. 475, 477, the court drew this distinction:

"It is true that Mrs. Randall kept house for her father, nursed him, and ministered to his wants when he was sick, but she did this, not in the capacity of a hired nurse, but as an affectionate and dutiful daughter, and in such case her acts of kindness raise no presumption against the validity of the deed."

And in Cook v. Higgins, 290 Mo. 402, 426, 235 S. W. 807, 814:

"In considering the question as to whether or not a fiduciary relationship existed between appellant and Mrs. Brown, we have examined all of the authorities cited by learned counsel for appellant and find, with one exception, that the grantee in the deed attacked was a son, a daughter, a brother, a sister, or some other blood relative of the grantor, and that the conveyance was made out of affection in return for the faithful and loving performance of kind and dutiful attentions. It was never intended that services of that character should be penalized, and it is only when these 'natural sentiments have been prostrated to unnatural and selfish ends that the law interposes to protect the victim.' "

We have examined particularly appellant's citations on this point, which include some of the foregoing and other cases such as Huffman v. Huffman, 217 Mo. 182, 192, 117 S. W. 1, 3; Lee v. Lee, 258 Mo. 599, 613, 167 S. W. 1030, 1035; Goodman v. Griffith, 238 Mo. 706, 718, 142 S. W. 259, 262. But these decisions do not and cannot mean that before the relation between parent and child can be held a *fiduciary* relation undue influence must be *proven*. That would destroy the presumption altogether; and we know from such cases as Mowry v. Norman, supra (204 Mo. l. c. 189, 103 S. W. l. c. 18) that is not the rule. In our opinion the general principle underlying the authorities is that when the chancellor may fairly conclude from the evidence the party sustaining the relation (usually the beneficiary of it) was acting not so much out of affection and filial duty as from self-interest, the presumption arises.

II. In the instant case the record shows the appellant to have been rather acquisitively inclined from the outset. She was unwilling to go to Chariton County and take care of her mother unless compensated for it. She is not to be blamed for that in the circumstances, but it shows the relation. She wanted eighty acres deeded to her and wanted it in advance. The mother demurred at first, but finally consented on condition that there be inserted in the deed a restriction against sale during her lifetime. The deed was made and the daughter came.

In 1917, after the mother became paralyzed, the appellant took over from her brother James Hershey the management of her mother's business affairs, and this not without some friction and unpleasant-

ness it appears, though her sister Mrs. Wheeler was her friend or partisan in this matter. Relations became so strained that James Hershey during the last two years of the mother's life did not go to the old home. In the meantime the appellant operated the mother's 160 acres and her own eighty acres, handling all the funds, making all the arrangements, etc. We have it from her mainly, by hearsay, that during the earlier part of the period the mother gave directions as to her wishes concerning these business matters, and that during the latter part she was told what was being done and understood it, but it is evident from her condition that she was necessarily dependent on the appellant.

In June, 1919, the first deed to the forty acres was made. This gave the appellant 120 acres, or one-half of all the land the father had left. Eighteen months later, when the mother's life span had but six months to run, as it later eventuated, the appellant received another deed, this time for all the land remaining, and including even the forty acres conveyed by the previous deed. Both were straight warranty deeds. They were silent as to the restriction against sale during the mother's life, a condition which the mother had tenaciously insisted upon when the original contract was made in 1911. They denuded her of all her property and left all the other children without inheritance. None of the other children were consulted—they say—except Mrs. Wheeler. This whole course of conduct is not reassuring.

Following that we have it from the appellant's own letter that when her brother James Hershey threatened her with litigation on the ground that the mother was mentally incompetent, she deeded him a child's share of the 160 acres; and while he disclaims any recollection of it, the weight of the evidence pointed that way. She wrote the plaintiff William Hershey and offered to do the same thing with him. She spoke rather disparagingly in the letter of the attitude of the other children—said taking care of her mother had "taken much more than talk from others that have done nothing for her."

There are other facts in the record tending to show there was undue influence, or at least that the appellant was willing to exert influence to get the conveyances. She was in charge of everything. The mother was helpless—so helpless that Judge Drace, the scrivener, when asked if he knew the mother understood what she was doing when she made the deeds, answered, "I have no way of knowing she knew," and again, "very often old people of that age understand things and you have no way of knowing whether they do or not." We think there was something beside a normal affectionate relation between parent and child in this case, that the presumption of undue influence arises and has not been overthrown, and that the two deeds

502

to the appellant and the one to the defaulting defendant James M. Hershey should be set aside.

III. One other point has been suggested by appellant. It is that there is no evidence in the case showing "the property in dispute is the property of all the heirs and not of this one defendant" (meaning the appellant), or that the estate of Mrs. Hershey, the decedent, has been administered upon and her debts paid, or that there is sufficient personalty in her estate to pay them. This objection is aimed at the partition side of the case. It is true the necessity for making a formal showing of the facts necessary to partition was rather lost sight of in the heat of trial on the other issues. But the appeal is from the interlocutory decree on that branch of the litigation. Those matters can receive the attention of the court when further proceedings are had.

The judgment is affirmed, and the cause is remanded for further proceedings in partition. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion of ELLISON, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting.